# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

RFE/RL, INC.,

Plaintiff-Appellee,

v.

KARI LAKE, *et al.*,

Defendants-Appellants.

———————

## EMERGENCY MOTION FOR AN ADMINISTRATIVE
## STAY AND STAY PENDING APPEAL

———————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney
  General*

MARK R. FREEMAN
DANIEL TENNY
ABIGAIL STOUT
BENJAMIN C. WEI
  *Attorneys*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.  Parties

Plaintiff is RFE/RL, Inc. (commonly known as Radio Free Europe/Radio Liberty).  Defendants are Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; Victor Morales in his official capacity as Acting CEO of the U.S. Agency for Global Media; and the United States Agency for Global Media.

## B.  Ruling Under Review

Appellants have appealed the memorandum order granting Radio Free Europe's motion for a temporary restraining order, Dkt. No. 48, entered on April 29, 2025.  The order is attached to this motion.

## C.  Related Cases

This case has not previously been before this Court. There are five other related cases currently pending in the United States District Court for the District of Columbia or this Court. *See Widakuswara v. Lake*, No. 25-1015 (D.D.C.), *appeal pending*, No. 25-5144 (D.C. Cir.); *Abramowitz v. Lake*, No. 25-887 (D.D.C.), *appeal pending*, No. 25-5145 (D.C. Cir.); *Open Technology Fund v. Lake*, 25-840 (D.D.C.); *Middle*

*East Broadcasting Networks, Inc. v. Lake*, 25-966 (D.D.C.), *appeal pending*, No. 25-5150 (D.C. Cir.); *Radio Free Asia v. Lake*, 25-907 (D.D.C.), *appeal pending*, No. 25-5151 (D.C. Cir.).

*s/ Daniel Tenny*
Daniel Tenny

## INTRODUCTION

We respectfully request a stay pending appeal, and an immediate administrative stay, of an order requiring the United States Agency for Global Media to pay $12 million to plaintiff RFE/RL, Inc. (commonly known as Radio Free Europe/Radio Liberty, and referred to here as Radio Free Europe). We are informed that the irrevocable steps to release the funds could be taken as early as tomorrow morning, so we respectfully request an administrative stay today to allow this Court to consider this motion.

The United States Agency for Global Media and Radio Free Europe were in the middle of negotiations for a master grant agreement. Mistakenly believing it was authorized to superintend the parties' contractual relationship, the district court ordered the Agency to "immediately enter into a grant agreement with Plaintiff covering April 2025 under the same terms and conditions applicable to the most recent master agreement," and then ordered the Agency to "immediately disburse" $12,178,590 in public funds to plaintiff pursuant to that court-imposed agreement.

This order cannot be squared with the fact that negotiations between the parties on a new grant agreement were ongoing, and thus there has been no final agency action subject to review. Nor can the order be reconciled with the Supreme Court's recent stay of a district-court order that, like the order here, erroneously asserted jurisdiction to compel the government to make grant payments. *See Department of Educ. v. California*, 604 U.S. ---, 2025 WL 1008354, at *1 (Apr. 4, 2025).

Defendants therefore respectfully request an emergency stay pending appeal to ensure that this Court has an opportunity to consider the government's arguments before $12.2 million of taxpayer money is paid under terms the government does not think are appropriate. Due to the imminence of the payment, the court should also enter an immediate administrative stay to ensure the money is not finally paid before the court can decide this motion.[1]

## STATEMENT

### A.    Background

The U.S. Agency for Global Media ("Agency"), governed by the International Broadcasting Act of 1994, has the mission to inform,

---

[1] In its order, the district court denied the government's request for a stay pending appeal.

engage, and connect people around the world in support of freedom and democracy. To carry out this mission, Congress authorized the Agency to employ grants to fund certain entities under its supervision. Specifically, the statute provides the Agency's Chief Executive Officer authority to: "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the [Agency] and grantees, subject to reprogramming notification requirements in law for the reallocation of funds." 22 U.S.C. §§ 6204(a)(5), (a)(6).

Section 6204 of the International Broadcasting Act also vests the Agency's Chief Executive Officer with broad authorities, empowering him to: "supervise all broadcasting activities conducted" by grantees; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could

be made more efficient and economical." 22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).

The plaintiff in this case, Radio Free Europe, is addressed specifically by statute. The statute provides that "[g]rants authorized under section 6204 of this title for [Radio Free Europe], shall be available to make annual grants for the purpose of carrying out similar functions as were carried out by [Radio Free Europe] on the day before April 30, 1994. 22 U.S.C. § 6207(f). Section 6207 sets forth "limits on grants for Radio Free Europe and Radio Liberty." *Id.* § 6207. Among other limitations, this section sets a ceiling for "the total amount of grants made for the operating costs" of Radio Free Europe for a particular year, *id.* § 6207(c), and prohibits the Agency from entering into a grant agreement unless Radio Free Europe's "certificate of incorporation . . . has been amended" to include certain specifications regarding Radio Free Europe's Board of Directors, *id.* § 6207(a) (stating that "the Board of Directors of [Radio Free Europe] shall consist of the members authorized under section 6204(a)(20)" and providing that "such Board of Directors shall make all major policy determinations governing the operation" of Radio Free Europe "and shall appoint and

fix the compensation of such managerial officers and employees of [Radio Free Europe], as it considers necessary").

The statute also addresses requirements related to Radio Free Europe's principal place of business and specifies five separate provisions that "shall" be included in grants with Radio Free Europe. 22 U.S.C. §§ 6207(b), (g). Finally, under Section 6207, "[g]rants to [Radio Free Europe] by [the Agency] shall only be made in compliance with a grant agreement." *Id.* § 6207(g).

Appropriations statutes make funding available for grant awards. In particular, Congress provided that appropriated funds should be "allocated" in accordance with a table, and the referenced table specifies amounts to be allocated to particular entities, including Radio Free Europe. Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735; *see also* Continuing Appropriations Act, 2025, Pub. Law No. 118-83, 138 Stat. 1524 (2024); American Relief Act, 2025, Pub. Law No. 118-158, 138 Stat. 1722 (2024); Congress's Full-Year Continuing Appropriations and Extensions Act, 2025, H.R. 1968, 119th Cong. § 1101(a) (2025).

## B.    This Litigation

1. Because the federal government had been operating under a continuing resolution that did not cover the full fiscal year, the Agency and plaintiff have not entered into a full-year grant agreement for fiscal year 2025. Instead, there have been a series of part-year agreements. The government and plaintiff entered into an agreement through February 28, 2025, on the same terms as the prior year's agreement. Add. 4. Although the parties negotiated an extension beyond that, the Agency never executed it. *Id.*

On March 15, 2025, the Agency informed plaintiff by letter that it was terminating its grant agreements. *See* Add. 5. In response, plaintiff moved for a temporary restraining order and preliminary injunction on March 19, seeking immediate disbursement of $7,464,559 in funds for the period of March 1-14, 2025, and an order enjoining implementation of the termination letter. *See* Dkt. No. 6. The Agency disbursed the funds on March 24. Dkt. No. 13. After a hearing on March 24, the district court entered a temporary restraining order on March 25, ordering that "the defendants and their agents take no steps and impose no obligations relating to closing out the plaintiff's grant." Dkt.

No. 14, at 9, and Minute Entry (March 24, 2025). The next day, March 26, the Agency withdrew the termination of plaintiff's grant, stating that plaintiff's grant was "back into effect." Dkt. No. 15 at 1.

Since the last grant agreement expired in February, the Agency and plaintiff returned to negotiations with the goal of entering a new master grant agreement covering all of FY 2025. The Agency sent a proposed master grant agreement to plaintiff on the morning of April 9—two weeks after the grant termination was rescinded. Dkt. No. 42-1.

Less than 24 hours later, plaintiff filed a motion for a temporary restraining order, seeking over $12 million "that Plaintiff expends to operate in April 2025 based on the absence of an approved financial plan or lack of agreement on the new terms and conditions that Defendants sought to impose on April 9, 2025." Dkt. Nos. 28, 28-6, at 3. Plaintiff then amended its complaint on April 14, 2025, adding allegations concerning the provisions in the April 9 version of the proposed master grant agreement that plaintiff found unacceptable. *See* Dkt. No. 38.

The Agency responded the following day by asking plaintiff to provide via redline its input on the proposed grant agreement. *See* Dkt.

No. 42-1, at 6. Plaintiff did so on April 16, *see id.* at 5, and, on that same day, the Agency accepted several of plaintiff's proposed revisions, including extending the period for compliance for a number of proposed provisions. *See id.* Plaintiff responded that those extensions did not address plaintiff's concerns. *See id.* at 2.

On April 22, 2025, plaintiff filed a motion for a preliminary injunction seeking an order requiring, as relevant here, (1) payment of funds to which it would be entitled for the month of April under its previously operative grant agreement, and (2) the Agency's entry into a grant agreement for the balance of 2025 that "does not contain unlawful, unreasonable, or unworkable conditions." *See* Pl.'s Proposed Order, Dkt. No. 41-9, at 2.

On April 24, 2025, the Agency sent an email asking plaintiff to provide a redline identifying the additional changes that it seeks to the proposed grant agreement. Dkt. No. 42-1. Plaintiff has not asserted that it has responded to that request.

2. On April 29, the district court granted plaintiff's motion for a temporary restraining order, ordering the government to "immediately enter into a grant agreement with Plaintiff covering April 2025 under

the same terms and conditions applicable to the most recent master grant agreements between the parties" and "immediately disburse [plaintiff's] April funding in the amount of $12,178,590." Add. 22.

To reach its conclusion, the district court first held that the Tucker Act did not divest it of jurisdiction because the "source of [plaintiff's] rights is not rooted in any grant agreement" but rather "two statutory schemes: the International Broadcasting Act and the continuing resolutions to the 2024 Consolidated Appropriations Act." Add. 8. Adopting the reasoning it used in the related case of *Widakuswara v. Lake*, No. 25-1015 (D.D.C.), *appeal pending* No. 25-5144 (D.C. Cir.), the court concluded that plaintiff's entitlement to funds does not depend upon the grant agreements, which are only "vehicle[s] to distribute congressionally appropriated funds" and thus "incidental to [plaintiff]'s claims." Add. 8-9. The court further concluded that the relief plaintiff seeks is "access to congressionally appropriated funds" and not "money damages." Add. 9.

The district court then found that plaintiff established a likelihood of success on the merits of its APA claim. Addressing only a one-month extension of the prior grant agreement to disburse funds for April 2025,

the court first determined there had been "final agency action" because the Agency had not responded to plaintiff's inquiries on the matter. Add. 12. The court next held that the decision was "arbitrary and capricious" because "defendants have provided no explanation," Add. 13, and because the court believed the government had not considered plaintiff's reliance on monthly disbursement of funds, Add. 14.

Finally, the district court concluded that the remaining factors favor an injunction. Specifically, the court reasoned that plaintiff has demonstrated irreparable harm because the loss of funding would lead to a potential shuttering. Add. 16. The court also concluded that the balance of the equities and the public interest also favor an injunction because it viewed plaintiff as likely to succeed on its APA claim and because there is a public interest in supporting "broadcasting to other nations." Add. 17. The court refused to stay its order pending appeal "because a stay would defeat the purpose of the Court's relief." Add. 17.

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable

injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.     The Temporary Restraining Order is Appealable

The affirmative and conclusive directive in the district court's order leaves no doubt that it is immediately appealable under 28 U.S.C. § 1292(a)(1). Far from seeking to maintain "the status quo" while the district court considers a request for a preliminary injunction, *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978), the court's order directs the government to, within 48 hours, "immediately enter into a grant agreement with Plaintiff covering April 2025 under the same terms and conditions applicable to the most recent master agreement" and "immediately disburse" $12,178,590 in public funds. Add. 22. The order is thus not temporary, as the district court has definitively resolved how and under what conditions the government must dispose of this universe of funds. Such an order to pay funds, the Supreme Court recently clarified, is an appealable injunction regardless of how it is labeled. *See Department of Educ. v. California*, 604 U.S. ---, 2025 WL 1008354, at *1 (Apr. 4, 2025).

If this Court were to conclude that the order is unappealable, the Court should exercise its discretion to construe this motion as a petition for writ of mandamus. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 548 n.6 (D.C. Cir. 1992). The district court's extraordinary order readily satisfies the standard for that relief. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004). Any money that is paid pursuant to the district court's order cannot be recovered, leaving the government with "no other adequate means to attain the relief." *Id.* at 380 (quotation marks omitted). Given that the APA plainly does not authorize the district court to order the government to pay sums of money by a date certain, the government's right to relief is "clear and indisputable." *Id.* at 381 (quotation marks omitted). And mandamus is "appropriate under the circumstances," *id.*, because the district court has positioned itself to superintend the Executive Branch's issuance of grant agreements and payment of public funds without regard to the ordinary mechanisms for entering into grant agreements and making payments.

## II. The Government is Likely to Succeed on Appeal

The district court's injunction reflects several critical errors. The court ignored the context of the ongoing negotiations between the parties to artificially create a "final agency action" regarding the month of April. The court also failed to realize plaintiff was not, in the first instance, entitled to any public funds because it had not yet entered into a grant agreement. And finally, the district court erroneously concluded it (and not the Court of Federal Claims) had jurisdiction to order the government pay plaintiff $12,178,590.

### i. *The district court erred in pretermitting ongoing negotiations between the parties.*

The district court erred by ordering the government to enter into a specific grant agreement for April 2025. As discussed above, the statute plainly contemplates that the government will negotiate a grant agreement with plaintiff, and that payments will be made pursuant to that agreement. 22 U.S.C. § 6207(g). Here, the parties are in the process of negotiating a grant agreement that would cover the rest of fiscal year 2025, including April. That process began shortly after the passage of the latest appropriations statute on March 15, which provided the predicate funding.

Yet rather than respect the process, the district court interjected itself to require the parties to enter into a short-term grant agreement because the negotiations were not progressing on a time frame the court thought appropriate. This overreach led to several related errors.

First, the court failed to apply the standard applicable to agency inaction. Although the APA permits courts to compel agency action that has been "unlawfully withheld or unreasonably delayed," it places strict limits on judicial review of alleged agency inaction. 5 U.S.C. § 706(1). Because the APA "carried forward" the common law writ of mandamus in Section 706(1), the standards applicable to mandamus also apply to assessing a claim of unreasonable delay or unlawfully withheld agency action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). "[M]andamus is an extraordinary remedy [and courts] require similarly extraordinary circumstances to be present before [they] will interfere with an ongoing agency process." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (citation omitted). "To show entitlement to mandamus, [Radio Free Europe] must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate

alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016); *see also Norton*, 542 U.S. at 63-64 (mandamus is available only where a federal agency has a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command" (citations omitted)). "These three threshold requirements are jurisdictional." *Am. Hosp. Ass'n*, 812 F.3d at 189.

The district court failed to apply this test altogether, and plaintiff cannot meet it. Even assuming that the International Broadcasting Act requires the Agency and plaintiff to enter into grant agreements, that duty is not ministerial and requires substantial exercise of the Agency's judgment and discretion. Indeed, the statute does not require the Agency to act on any particular timeline or identify all the terms of the grant agreement, let alone create a clear and indisputable right to a grant on plaintiff's timeline and with its preferred terms and conditions. Such a reading would be contrary to the statute's granting of the Agency with oversight responsibilities to "make and supervise" and "establish guidelines" for grant agreements to Radio Free Europe. 22 U.S.C. §§ 6204(a)(5), 6207(g).

The district court concluded here that there was a final agency action by stripping the context to the Agency's non-response to requests for a temporary agreement for April 2025. Add. 11. But this occurred as part of negotiations over a master grant agreement for 2025 and the requests for a temporary agreement were portions of emails covering a broader range of topics. This is a far cry from a rule, order, license, sanction, or relief, which the APA defines and requires for "agency action." 5 U.S.C. § 551(13). That is even more true given the context of this construed refusal—contract negotiations, which are characteristically "fluid, uncertain, and, to a large extent, ad hoc" and definitionally involve "give and take." *Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983) ("Courts reviewing a contract negotiation must be mindful of the considerable leeway an agency has in that setting to balance and accommodate competing interests."). If the non-response to portions of two emails in the context of contract negotiations were subject to APA review, as the court believed, then government agencies would be paralyzed by challenges to every failure to respond to specific questions, offers, or requests by grantees (or others, for that matter). This is not "agency action" under the APA.

Rather than grapple with the "agency action" requirement, the district court jumped into the finality analysis. But that analysis also suffers from fundamental problems. The parties were in active contract negotiations, and the Agency had not decided those negotiations were at an impasse. Plaintiff's request for a short-term April agreement was peripheral to the parties' principal negotiations over the master grant agreement. There was no consummation of the decision-making process for a master grant agreement, and no final decision to deny plaintiffs funding for April. *See Bennett v. Spear*, 520 U.S. 154, 177– 78 (1997). Instead, the Agency was in the process of seeking an agreement about the terms on which such funds (and funds for the remainder of the year) would be provided. That is not inaction tantamount to a refusal. Plaintiff has no statutory or other right to a short-term agreement while a master grant agreement is being negotiated. The court should have permitted those negotiations to continue and should not be permitted to upend the parties' negotiations because the court is dissatisfied with them.

The court cited no precedent for carving up an agency decision into a set of sub-decisions about whether to accept individual proposals

and treating each as a final agency action. Instead, the court cited the principle that "an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970). As discussed, that analysis was mistaken, but in addition the very case relied upon by the district court makes clear that even in circumstances where inaction amounts to a denial, because the agency action must be taken by the agency itself and not by the court, it was appropriate to "remand the case to the Secretary, either for a fresh determination . . . or for a statement of reasons for his silent but effective refusal." *Id.* at 1100. Here, similarly, the statute mandates that the Agency—not the court—"shall establish guidelines for" grants with Radio Free Europe. 22 U.S.C. §6207(g). The court instead improperly arrogated to itself the authority to determine the terms on which the Agency should enter into a funding agreement.

ii.   *The district court erred by concluding it had jurisdiction to order the Agency to pay plaintiff $12,178,590.*

Even if this Court views the Agency's non-response to certain portions of plaintiff's two emails as unlawful final agency action, the district court erred because it lacks jurisdiction to order the payment of

money under a government contract. *See U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025). The fact that the court ordered the parties to enter into the contract does not alter that jurisdictional bar. Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, the district court lacked "the authority to afford the 'drastic' emergency relief that [plaintiffs] see[k]." *Id.* at *8 (quoting *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)).

The federal government is generally "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted); *California*, 2025 WL 1008354, at *1. That carve-out "prevents plaintiffs from exploiting the APA's waiver to

evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 215.

Where a party seeks funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As this Court has explained, "the Tucker Act impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted); *see also U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4 (explaining that this Court has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government" (quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis in original))). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the

terms of and receive commitments from recipients." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, this Court looks at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

Where, as here, a plaintiff seeks the payment of money under a contract, that inquiry is straightforward. Accordingly, the Supreme Court recently granted a stay of another order to make payments based on grant agreements, concluding that the government was likely to succeed in showing that the district court "lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over such suits. *Id.*

That reasoning applies with full force here. The relief ordered by the district court illustrates the error of its analysis. Rather than ordering the government to make payment because payment was

compelled by the statute, the court first ordered the government to enter into a new grant agreement for April 2025, and then to make payment under that grant agreement. The court's implicit recognition that the payment could only be compelled if a new grant agreement was entered into cannot be reconciled with the court's insistence that plaintiff's "entitlement to the funds . . . does not depend principally on the grant agreement." Add. 9.

The district court was correct that a grant agreement was required for the Agency to pay funds. The International Broadcasting Act authorizes the Agency to "make and supervise grants and cooperative agreements for broadcasting and related activities," 22 U.S.C. § 6204(a)(5). The relevant appropriations act similarly instructs the Agency to exercise its grantmaking authority in making appropriated funds available to particular grantees. *See* Pub. L. No. 118-47, 138 Stat. at 735 (directing Agency to make funds "available in accordance with the principles and standards set forth" in, among other statutes, 22 U.S.C. § 6204). And the statute specifically provides that a grant to Radio Free Europe "shall only be made in compliance with a grant agreement," which "shall," in turn, "establish guidelines for such

grants." 22 U.S.C. § 6207(g). Thus, even having erroneously ordered the government to enter into a grant agreement, the district court was without authority to order the government to pay money pursuant to that agreement.

   iii.   *The district court erred in intervening in the parties' ongoing negotiations.*

The equities likewise weigh decisively in the government's favor. "[T]he public interest and balance of equities factors merge" where, as here, "the government is the party" against whom an injunction is sought. *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

1. By intervening in the parties' negotiations and ordering the Agency to enter into a grant agreement with terms it had decided were inappropriate, the district court severely overstepped into the Agency's operations and statutory prerogative to "make and supervise" grant agreements. This overstep not only forced the Agency to enter a grant agreement against its judgment, it also impermissibly ordered the Agency to pay Radio Free Europe millions of taxpayer dollars free from terms and conditions the Agency believes are necessary. This irreparably harms the public fisc. If the order is stayed, the Agency will retain the grant money at issue for now while the parties complete

negotiations and enter into a grant agreement agreeable to both sides. If the order is not stayed, then Radio Free Europe will improperly receive $12,178,590 pursuant to an improper order and expend those funds during the litigation. The Agency will be left with no meaningful recourse even if it prevails.

2. The order also harms the Agency's ability to control its own operations. By ordering the Agency to enter into a grant agreement under particular terms and conditions, the court usurped the Agency's role to "make and supervise" and "establish guidelines" for grant agreements with plaintiff. But the court's order leaves other rubble in its wake. The order addresses one month—April—meaning the issue of entering into a master grant agreement for the rest of the fiscal year remains unresolved. But now, the district court's order has stymied the parties' negotiations and severely hampered the Agency's negotiating position. In short, the order puts a judicial thumb on the scale and gives Radio Free Europe a bargaining chip—a court order—in the ongoing negotiations. Such intervention irreparably harms the Agency's ability to negotiate and statutory authority to "make and supervise" grant agreements.

3. Radio Free Europe, meanwhile, would not be irreparably harmed by a stay of the preliminary injunction. The gravamen of its injury is monetary—the classic example of reparable harm. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted), *cert. denied*, 569 U.S. 994 (2013). Moreover, legal action is not required for Radio Free Europe's harms to be remediated. As of this date, it has a live offer for a grant agreement before it and signing the agreement and/or earnestly and expeditiously negotiating the agreement would remedy the harms it has alleged.

## CONCLUSION

For the foregoing reasons, this Court should grant a stay pending appeal, putting an administrative stay in place while it considers this motion.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney
    General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney
    General*

MARK R. FREEMAN

*s/ Daniel Tenny*
DANIEL TENNY
ABIGAIL STOUT
BENJAMIN C. WEI
  *Attorneys, Appellate Staff
  Civil Division, Room 7215
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-1838
  daniel.tenny@usdoj.gov*

MAY 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,842 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Daniel Tenny*
Daniel Tenny

# ADDENDUM

## TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 8(a)(2)(B)(iii)**

Memorandum Opinion (April 29, 2025) (Dkt. No. 48) ..................... Add. 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**RFE/RL, INC.**,

        *Plaintiff*,

**v.**

**KARI LAKE**, in her official capacity as
Senior Advisor to the Acting CEO of the
United States Agency for Global Media, *et
al.*,

        *Defendants*.

**Case No. 1:25-cv-799-RCL**

## MEMORANDUM ORDER

Before the Court is Plaintiff RFE/RL's Motion for a Temporary Restraining Order (TRO)[1]

seeking to enjoin the defendants, the U.S. Agency for Global Media (USAGM) and the acting

leadership of the agency, to immediately disburse $12,178,590 in congressionally appropriated

funds to cover RFE/RL's expenditures for the month of April 2025. For the reasons contained

herein, the Motion is **GRANTED**.

## I.    BACKGROUND

Plaintiff RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty, is a

nonprofit news organization that provides reporting to twenty-three countries across Europe,

Central and South Asia, and the Middle East. RFE/RL is funded almost entirely by congressional

appropriations, which are disbursed from USAGM via grant agreements. *See RFE/RL, Inc. v.

Lake*, No. 25-cv-799-RCL, 2025 WL 900481, at *1 (D.D.C. Mar. 25, 2025) (detailing the history

---

[1] In this lawsuit, RFE/RL has moved for two forms of preliminary relief: 1) a TRO, which is the motion at issue in the instant Order, and 2) a preliminary injunction (PI), which would order the defendants to effectuate a grant agreement with RFE/RL to disburse congressionally appropriated funds through September 30, 2025. *See* Mot. for TRO, ECF No. 28; Mot. for PI, ECF No. 41. With this Order, the Court only addresses the TRO Motion, while it takes the PI Motion under advisement.

Add. 001

of RFE/RL's funding by the United States government).  Because the has already discussed the

history of RFE/RL in some detail, *see id.*, the Court here adds only as much additional background

information as is essential for purposes of the pending TRO motion.

### A.  Typical Grantmaking Process between RFE/RL and USAGM

The United States International Broadcasting Act of 1994 (the "International Broadcasting

Act") provides that "[g]rants authorized under section [6204 of this title] for RFE/RL,

Incorporated, shall be available to make annual grants" for RFE/RL's operations.  22 U.S.C.

§ 6207(f).  To that end, every year, RFE/RL and USAGM enter into a Master Grant Agreement to

facilitate the disbursement of congressional appropriations.  Fourth Declaration of Stephan Capus,

President and CEO of RFE/RL ("Fourth Capus Decl.") ¶ 2, ECF No. 41-2.  Until the events at the

center of this lawsuit, RFE/RL and USAGM had been operating based off of a version of the

Master Grant Agreement dating back to 2011.  *Id.*  During typical annual grant negotiations, over

the course of a couple weeks, RFE/RL and USAGM will discuss and implement "minor" changes

to incorporate into that year's grant agreement.[2]  *Id.*  The Master Grant Agreement will typically

include, as an attachment, RFE/RL's Approved Financial Plan summarizing RFE/RL's planned

monthly spending.  *Id.* ¶ 3.  Normally, RFE/RL receives its monthly funding from USAGM at the

beginning of each month.  *Id.* ¶ 19.

### B.  Congressional Appropriations for FY 2025

In the 2024 Appropriations Act, Congress appropriated $857 million to USAGM for Fiscal

Year (FY) 2024 and mandated how those funds "shall be allocated" pursuant to an "explanatory

statement."  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I,

---

[2] For example, the FY 2025 Master Grant Agreement signed by RFE/RL in February 2025 changed the frequency of certain required reports from "monthly" to "quarterly."  Fourth Capus Decl. ¶ 2.

138 Stat. 460, 735 (2024) (requiring funds to be allocated in accordance with a table in "the explanatory statement" described in section 4").  The explanatory statement sets forth a table, which earmarks $142.2 million for RFE/RL for FY 2024.  Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (providing table designating how funds appropriated for international broadcasting "are allocated").  USAGM has limited discretion to "reprogram" a small fraction of these funds among different programs, but only if it gives the House and Senate Appropriations Committees fifteen days' advance notice.  2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see* 170 Cong. Rec. at H2087.  And in no event may any reprogramming reduce funding for a program by more than five percent of what Congress designated.  *Id.*

In three continuing resolutions collectively covering FY 2025, Congress funded USAGM at the same levels, and subject to the same conditions, as it funded USAGM in FY 2024.  *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY 2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).  As is relevant here, with the passage of the Third Continuing Resolution, signed into law on March 15, 2025, Congress appropriated approximately $77 million for RFE/RL through September 30, 2025.  First Declaration of Stephen Capus, President and CEO of RFE/RL ("First Capus Decl.") ¶ 20, ECF No. 6-3.

Add. 003

### C.  Factual and Procedural History

The last fully executed full-year Master Grant Agreement between RFE/RL and USAGM is the FY 2024 Master Grant Agreement.  *See* Declaration of Joseph Lataille, Chief Financial Officer of RFE/RL ("First Lataille Decl.") ¶ 3, ECF 33-1.  Following the passage of the First Continuing Resolution extending FY 2024 appropriations through December 20, 2024, USAGM executed a preliminary grant agreement for RFE/RL that extended the terms and conditions of the FY 2024 Master Grant Agreement.  *Id.*  ¶ 4.  And following the passage of the Second Continuing Resolution appropriating funds through March 14, 2025, USAGM executed another preliminary grant agreement under those same terms, obligating funds to RFE/RL through February 28, 2025.[3] *Id.* ¶ 5.

On February 14, 2025, USAGM began the usual process for executing a new Master Grant Agreement for the fiscal year by sending RFE/RL a draft FY 2025 Master Grant Agreement.  *Id.* ¶ 6.  Over the next week, RFE/RL and USAGM negotiated revisions to the agreement to cover funding appropriated to RFE/RL through September 30, 2025—the end of FY 2025.  *Id.*  On February 27, 2025, USAGM sent a final version of the grant agreement to RFE/RL and requested a "signed version of this Master Grant Agreement at your earliest convenience."  *Id.*  RFE/RL responded with the signed grant agreement that same day.  *Id.*  USAGM confirmed receipt of the signed agreement the next day, stating that there were no "issues with countersigning the grant agreement."  *Id.*  But despite this representation, USAGM never returned the countersigned grant agreement to RFE/RL and provided no explanation for not doing so.  *Id.* ¶ 7.

---

[3] In this preliminary grant agreement, USAGM did not at first obligate the March 1–14, 2025, funds.  Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees.  Compl. ¶ 32.  RFE/RL was therefore under the impression that it would receive funds for March 1–14 in the next grant agreement.

Add. 004

Then, on March 14, 2025, President Trump announced Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," which orders the elimination of "non-statutory components and functions" of USAGM "to the maximum extent consistent with the applicable law." Exec. Order 14238 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/. The next day, on March 15, RFE/RL received a letter from USAGM terminating RFE/RL's grant agreements, stating that RFE/RL "no longer effectuates agency priorities" and citing the President's Executive Order directing that USAGM eliminate all "non-statutorily required" activities and functions.

RFE/RL filed its Complaint on March 18 and moved for preliminary injunctive relief the next day—specifically, RFE/RL sought a TRO for disbursement of funds for the March 1–15 period of performance, and a PI ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025. On March 24, just hours before a scheduled hearing on the TRO motion, USAGM disbursed RFE/RL's funds to cover the March 1–15 grant period, but the Court still granted RFE/RL's TRO to enjoin enforcement of the termination letter's command that RFE/RL initiate "close-out" procedures. *See RFE/RL*, 2025 WL 900481, at *2–5.

On March 26, the day after the Court issued its TRO, USAGM rescinded the termination letter. Notice of Withdrawal of Grant Termination, ECF No. 15. The grant was therefore "back in effect," according to USAGM. *Id.* On March 27, RFE/RL sent a funding request to USAGM requesting the remaining congressionally appropriated funds for March 15–31, as well as for April 2025. First Lataille Decl. ¶ 9. On April 3, 2025, USAGM responded by sending a short grant agreement to cover funding only for March 15–31, incorporating the the terms and conditions of

Add. 005

the FY 2024 Grant Agreement.  *Id.*  RFE/RL signed this agreement and received its appropriated funds for that period on April 8, 2025.  *Id.* ¶ 12.

However, RFE/RL has still not received any funds for April 2025 or the rest of the fiscal year.  Following a status conference, on April 9, 2025, USAGM sent an email to RFE/RL attaching the "RFE/RL FY-25 Master Grant Agreement."  *Id.* ¶ 13.  This new agreement "contains numerous new terms and conditions that RFE/RL had never seen before in any grant agreement with USAGM."  *Id.*  Upon receipt of this email, RFE/RL moved for a TRO, seeking immediate disbursement of congressionally appropriated funds for the period from April 1 to April 30, 2025, totaling $12,178,590.  *See* Mot. for TRO, ECF No. 28.  RFE/RL argues that it will soon be forced to shut down without access to its April funds, and that the proposed FY 25 grant agreement from USAGM is unreasonable and a pretext for denying RFE/RL its congressional appropriations.  The defendants filed an Opposition to that Motion, *see* Resp. to Mot. for TRO ("TRO Opp'n"), ECF No. 32, and RFE/RL filed a Reply, ECF No. 34.

After holding another status conference on April 15, 2025, the Court declined to act on the pending TRO motion because negotiations over the new grant agreement were still ostensibly underway.  Since that time, the Court has granted a preliminary injunction in a related case.  *See Widakuswara v. Lake*, __ F. Supp. 3d. __, No. 25-cv-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025).  There, the Court ordered USAGM to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks, but denied relief as to RFE/RL given the ongoing nature of the negotiations between the parties.  *Id.* at *18; *see id.* at *12 n.23 ("[A]t this juncture, in the midst of negotiations, court intervention would be premature.").  However, the Court opined that "delayed, broken down grant negotiations and

indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review." *Id.* at *12 n.23.

On April 22, RFE/RL filed a Motion for a Preliminary Injunction, seeking an order for the defendants to commit to funding RFE/RL through September 30, 2025 via a grant agreement. *See* Mot. for PI, ECF No. 41. In its Motion, RFE/RL revisits its prior TRO Motion by observing that USAGM has "ignored RFE/RL's repeated requests for a short extension to their existing agreement, like the 'mini agreement' Defendants proposed and RFE/RL agreed to for March . . . [which is] alone sufficient reason for this Court to promptly enter a TRO concerning April funds while the Court considers a preliminary injunction." *Id.* at 2. The Court held a hearing on RFE/RL's pending motions on April 28, 2025, at which both parties presented argument. At this juncture, with only one full day left in April, the Court now addresses RFE/RL's TRO motion for the immediate disbursement of April appropriations.

## II.     Legal Standard

A TRO should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) a TRO is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the TRO analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### III.    DISCUSSION

### A.  The Court Has Jurisdiction to Entertain the TRO Request

The defendants argue that the Tucker Act, 28 U.S.C. § 1491(a)(1), is a jurisdictional bar to RFE/RL's claim.  TRO Opp'n at 9–13.  The Court has addressed this issue already in a related lawsuit, *see Widakuswara*, 2025 WL 1166400, at *9, but for the sake of comprehensiveness, will reproduce the relevant portions of the Court's reasoning here.

The Tucker Act mandates that suits to receive money damages for the government's alleged breach of contract must be heard in the Court of Federal Claims.  But a claim against the federal government falls within the exclusive jurisdiction of the Claims Court only if the claim is "at its essence" a contract claim.  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

Here, the Tucker Act does not divest this Court of jurisdiction because the source of RFE/RL's rights is not rooted in any grant agreement with USAGM, but rather, two statutory schemes: the International Broadcasting Act and the continuing resolutions to the 2024 Consolidated Appropriations Act.  The International Broadcasting Act instructs USAGM to provide grants on an annual basis to RFE/RL as a vehicle for dispensing congressionally appropriated funds.  And in the Consolidated Appropriations Act of 2024, Congress appropriated funds for RFE/RL—indeed, listing RFE/RL by name—allocating over $142 million in funding for that fiscal year.  Mot. for TRO at 7.  Congress has renewed RFE/RL's funding under those same conditions three times, most recently in the Third Continuing Resolution, appropriating funds through September 30, 2025.  In total, Congress appropriated approximately $77 million to

Add. 008

RFE/RL for performance between March 15, 2025 and September 30, 2025. But to date, USAGM has only dispensed $2.8 million to cover the period from March 15–31, 2025—withholding the $12 million that covers the period from April 1 to April 30, 2025. In so doing, USAGM is denying RFE/RL a significant sum of congressional appropriations that it is entitled to receive. The existence (or, in this case, non-existence) of a grant agreement between USAGM and RFE/RL is incidental to RFE/RL's claims—a grant is involved only as a vehicle to distribute congressionally appropriated funds because Congress requires USAGM to transmit funds to RFE/RL that way. *See Widakuswara*, 2025 WL 1166400, at *9. RFE/RL's entitlement to the funds, in other words, does not depend principally on the grant agreement.

The type of relief RFE/RL seeks is also not contractual in nature. RFE/RL is not seeking money damages; RFE/RL is seeking access to its congressionally appropriated funds. That is a request for specific relief based on the defendants' violation of federal statutes. The Supreme Court has recognized this distinction in no uncertain terms: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). And seeking disbursement of congressionally mandated appropriations is a well-recognized example of this distinction in action. *See*, *e.g.*, *Md. Dep't of Hum. Res. v. Dep't of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Plaintiff] will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (concluding that "[the plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages,'" and holding that the district court had jurisdiction to conduct APA review of the

Add. 009

plaintiff's claims).  Neither can it be fairly said that RFE/RL is seeking the contractual remedy of specific performance, because there *is no existing contract* for the disbursement of April funds. *See, e.g.*, *Brach v. United States*, 443 F. App'x 543, 546 (Fed. Cir. 2011) ("To invoke the court's jurisdiction" a plaintiff must "allege the existence of a contract as a basis for relief.").[4]  In other words, RFE/RL is claiming that the defendants are violating the APA by refusing to enter into a lawful and reasonable grant agreement to disburse April congressional appropriations.  The Court therefore finds that the Tucker Act does not pose a jurisdictional bar to this claim and will proceed to the merits of RFE/RL's claim.

## B.  RFE/RL Has Established a Likelihood of Success on the Merits of Its APA Claim

### i.    Final Agency Action

The APA permits judicial review of "final agency action."  5 U.S.C. § 704.  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177– 78 (1997).  Courts are to interpret the finality requirement in a "flexible" and "pragmatic" way.  *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986).  In that vein, "[a]t some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review." *Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970).  Here, the final agency action that RFE/RL challenges is USAGM's refusal to enter a one-month extension of the prior grant agreement as a vehicle to disburse $12 million in congressionally appropriated funds to RFE/RL for April 1–30, 2025.

---

[4] Even if RFE/RL's requested remedy could be construed as one for specific performance (of an expired contract), courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 611 (D.C. Cir. 1992).

Add. 010

The Court concludes this is a "final" agency action. Regarding the first *Bennett* factor, whether this action marks the "consummation" of USAGM's decisionmaking process, the record shows that USAGM has not once responded to RFE/RL's numerous inquiries about a one-month extension. Shortly after the Court's April 15 status conference, RFE/RL emailed USAGM asking for a one-month extension of the previous grant terms—like the one that USAGM had agreed to in order to disburse the March funds—given the urgency of receiving April funding. Mot. for PI at 9 (citing Second Lataille Decl. Ex. 1). USAGM ignored RFE/RL's request for a one-month extension, and responded only to the other parts of RFE/RL's email. *Id.* at 10. On April 16, RFE/RL expressed its understanding to USAGM that this amounted to a rejection of RFE/RL's request to enter into a "mini-agreement" for the April 2025 funds. *Id.* USAGM has still not responded to that communication. Second Lataille Decl. ¶ 2. At this Court's April 28, 2025 hearing, though RFE/RL brought up their request for a one-month extension several times (and the Court also conveyed its "understanding . . . that the defendant has refused to enter into a one-month extension agreement and has not disbursed the $12 million for April," *see* Tr. 3:15–19, ECF No. 47), the defendants did not directly engage with this issue, and instead argued that there is no final agency action to review. Tr. 26:25–27:4; 27:23–28:1; 30:19–31:2.

But the defendants fail to grapple with a crucial point: "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Hardin*, 428 F.2d at 1099. Such is the case here. Given the defendants' repeated refusal to engage with RFE/RL's request for a one-month extension, the Court comfortably interprets the defendants' action here as a denial of RFE/RL's request. By remaining silent, USAGM urges this Court to conclude that reconsideration is a possibility after further

negotiations—but turning a blind eye to the defendants' delay tactics would be a naïve conclusion, allowing the agency to indefinitely evade judicial review. The Court will instead apply this Circuit's "pragmatic" approach to finality and conclude that the apparent stonewalling from the defendants renders their decision here, to refuse an April extension, the "consummation" of the agency's decisionmaking process on the matter. *Ciba-Geigy,* 801 F.2d at 435; *Bennett*, 520 U.S. at 178.

The second *Bennett* factor is straightforward—USAGM's final decision to deny RFE/RL's request for a one-month "mini-agreement" for April constitutes a determination of "rights or obligations" because it results in the withholding of RFE/RL's congressionally appropriated funds for the month of April—an amount that, in the usual course of events, would have been disbursed at the end of March. As a consequence, RFE/RL faces a reality in which it will soon be forced to miss lease payments, furlough almost two-hundred additional employees, and shutter security defenses and other critical infrastructure—outcomes that the Court details further in Section III.C, *infra*. The Court therefore concludes that USAGM's decision to refuse a one-month mini-agreement to disburse RFE/RL's congressionally appropriated funds for April is a final agency action subject to judicial review.

### ii.    Arbitrary and Capricious

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

Add. 012

view or the product of agency expertise." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency has a duty to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *State Farm*, 463 U.S. at 43).

Here, the defendants have provided no explanation for their refusal to enter into a "mini-agreement" to disburse April funds, other than arguing in their opposition that RFE/RL "has no legal claim to the April funds it seeks" because there is no grant agreement in place and no approved April financial plan. PI Opp'n at 13, ECF No. 44. But this argument "entirely fail[s] to consider an important aspect of the problem": Congress has specifically appropriated funds to RFE/RL for the fiscal year, which gives RFE/RL a legal claim to the April funds.[5] The fact that there is no grant agreement in place is the very issue about which RFE/RL complains: that USAGM is using the absence of a grant agreement as a shield to prevent the disbursement of congressional appropriations. And the defendants appear to have no intention of disbursing RFE/RL's April appropriations unless RFE/RL signs the latest version of the FY 2025 Master Grant Agreement. *See, e.g.*, Tr. 30:23–25 ("If [RFE/RL] signed [USAGM's latest] grant agreement this afternoon, then the agency would begin the process of disbursing those funds"). But this is not a viable course of action for RFE/RL, because the current version of the grant agreement that USAGM has

---

[5] Though the defendants do not make this argument, the Court addresses it for the sake of comprehensiveness: there can be no reasonable dispute that RFE/RL has a legal claim to funds *on a monthly basis.* In other words, even if the defendants represented that they intend to disburse all congressionally appropriated funds before September 30, 2025 (a representation that they do not make), RFE/RL would still be entitled to the TRO relief here to ensure that disbursement is timely. In *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, the agency attempted to make the argument that "reliance interests only apply to the *receipt* of funds but not the *timing* of when they are received." No. 25-cv-239-LLA, 2025 WL 368852, at *11 n.8 (D.D.C. Feb. 3, 2025). The court rejected this argument because "having federal funds arrive on time and as scheduled is vital" to make payroll, afford rent, etc.—and it "defies logic" to ignore this reality. *Id.* This Court agrees—surely, when Congress enacted the relevant appropriations statutes here, it did not intend for a loophole in which the appropriations can be withheld until the receiving entity is forced out of existence.

Add. 013

presented contains provisions to which RFE/RL cannot lawfully or practically assent. For example, it includes a provision that would allow USAGM to determine the membership of RFE/RL's Board—an authority that Congress specifically repealed. *See* National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022). In short, RFE/RL cannot sign the agreement in its current form. Against this backdrop, where RFE/RL has been appropriated funds by Congress, typically disbursed on a monthly basis, and USAGM has radically changed the grant agreement that governs the disbursement of those funds—well after the fiscal year has already begun—it is arbitrary and capricious for USAGM to refuse to enter a one-month funding extension to obligate RFE/RL's April appropriations.

Moreover, USAGM refused to enter into a bridge agreement without any apparent consideration of the reliance interests at stake. "When an agency changes course, as [USAGM] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Here, RFE/RL has, for decades, relied on timely, monthly disbursement of its congressionally appropriated funds from USAGM. And since 2011, USAGM and RFE/RL have been operating off of the same version of a master grant agreement. Working off of this template, the parties fully negotiated a FY 2025 Master Grant Agreement back in February, which USAGM told RFE/RL to sign but which USAGM never countersigned thereafter. Then, USAGM abruptly changed course. USAGM presented a radically different grant agreement in the middle of April, with hardly any time for a meaningful negotiation to take place since RFE/RL is up against the clock as its funding quickly runs out. By refusing to enter into a one-month extension to keep RFE/RL afloat, in the

midst of this unprecedented course of action, USAGM has failed to consider RFE/RL's reliance interests, rendering its action arbitrary and capricious.

It appears to the Court, based on the defendants' unexplained refusal to throw RFE/RL a lifeline while negotiations could meaningfully take place, the defendants are trying to strongarm RFE/RL into signing their latest version of the Master Grant Agreement. *See*, *e.g.*, Tr. 18:9–16 (insisting that RFE/RL "has the ability to put an end to any irreparable harm it alleges at any point" by signing USAGM's latest grant agreement). This course of action upends the longstanding relationship between the parties and disregards RFE/RL's significant reliance interests, sounding the death knell for RFE/RL—a 75-year-old, statutorily created, congressionally funded entity. The Court concludes that this action is, at the very least, arbitrary and capricious.

### C. The Remaining TRO Factors Favor RFE/RL

The remaining three TRO factors are: whether the movant is likely to suffer irreparable harm; whether the balance of the equities favors a TRO; and whether a TRO is in the public interest. *Winter*, 555 U.S. at 20.

To demonstrate irreparable harm, the moving party must satisfy two requirements. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

Here, RFE/RL receives 99% of its funding from its annual congressional appropriations. First Capus Decl. ¶ 12. "While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the

Add. 015

very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 842360, at \*10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Because of USAGM's refusal to disburse the April appropriations, RFE/RL has already begun the process of winding down its operations.  RFE/RL has terminated nearly all of its contracts with freelance journalists, missed payments on leases, and furloughed 122 employees—and without access to its April funding, RFE/RL will begin the process of furloughing additional employees and canceling remaining contracts starting on May 1.  Mot. for PI at 2.  An organization can only survive so many rounds of missed payments, broken contracts, and lost employees before it is gone for good; RFE/RL need not wait until it has crossed that threshold to be deserving of preliminary injunctive relief.

Additionally, RFE/RL currently stores the majority of its content on unarchived, external platforms or on leased servers, and losing funding means that RFE/RL will no longer be able to maintain these platforms, eliminating these records forever.  First Capus Decl. ¶ 33.  RFE/RL will also "be forced to shutter its cyber defenses" if it loses funding, which "virtually guarantees that cyber attackers will gain access to sensitive RFE/RL systems."  First Mot. for TRO, ECF No. 6 at 36; *see All. for Retired Ams. v. Bessent*, No. 25-cv-0313-CKK, 2025 WL 740401, at \*22 (D.D.C. Mar. 7, 2025) (plaintiffs may show irreparable harm by "demonstrating that such a [data] breach or improper disclosure is likely in the absence of an injunction" (internal quotation marks omitted)).  The lack of April funding has also meant that RFE/RL has been forced to cancel contracts with certain vendors, including contracts for fire and safety inspections, security developer tools, and cloud services backups.  Fourth Capus Decl. ¶ 22.  Furthermore, RFE/RL will soon be forced to cancel security services that protect RFE/RL facilities and staff in a number of countries where RFE/RL journalists have been targeted by terrorist organizations, criminal

elements, and governments that are hostile to RFE/RL's reporting.  Mot. for PI at 40 (citing First Declaration of James Landis, Head of Corporate Security of RFE/RL ("First Landis Decl.") ¶ 17, ECF No. 6-4; Second Declaration of James Landis ("Second Landis Decl.") ¶ 5, ECF No. 41-4).

Based on this significant and comprehensive showing of harm amounting to a complete gutting of RFE/RL's infrastructure, the Court concludes that RFE/RL has demonstrated likely irreparable harm by showing that the defendants' actions "threaten the very existence of [the] business," *Wis. Gas Co.,* 758 F.2d at 674, and the "obstacles" created by defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *Newby*, 838 F.3d at 9.

Regarding the final two TRO factors, the balance of the equities and the public interest favor RFE/RL.  These factors "merge when the government is the opposing party." *Am. Ass'n of Pol. Consultants*, 613 F. Supp. 3d at 365 (quoting *Nken*, 556 U.S. at 435).  The Court has explained that RFE/RL is likely to succeed on the merits of its APA claim, and "[t]here is generally no public interest in the perpetuation of unlawful agency action"—here, the refusal to disburse over $12 million in congressionally appropriated funds for the month of April.  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Newby*, 838 F.3d at 12).  "There is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted).  And furthermore, Congress has enshrined into law that "[i]t is in the interest of the United States to support broadcasting to other nations," and for the last seventy-five years has specifically identified RFE/RL as the entity through which the United States will carry out this mission.  International Broadcasting Act, 22 U.S.C. § 6201(3).

Add. 017

Our Constitution provides that laws are enacted by the Congress and enforced by the Executive. When money has been appropriated by Congress, "the Executive has no residual constitutional power to refuse to spend these appropriations." *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243–44 (D.D.C. 1973). The Court finds that all four TRO factors weigh in favor of granting RFE/RL's requested relief.

### D.  The Court Will Neither Impose Bond nor Order a Stay Pending Appeal

Because RFE/RL is seeking the payment of a particular sum, i.e. $12,178,590, the defendants ask the Court to order the posting of a bond equal to that size. TRO Opp'n at 20–21. However, "where the defendants are already constitutionally required to distribute funds in accordance with the yearly appropriations bill . . . a bond would merely impose a financial barrier to litigation for plaintiffs seeking to vindicate their statutory and constitutional rights." *Widakuswara*. 2025 WL 1166400, at *17. For the same reasons articulated in *Widakuswara*, the Court declines to impose bond here.

The Court also will not stay this order pending appeal as the defendants request in their opposition, because a stay would defeat the purpose of the Court's relief. It is now the end of April and RFE/RL has received none of its appropriated funds for the month. A stay pending appeal would exacerbate the irreparable harms detailed in Section III.C, *supra*.

### IV.    CONCLUSION

As a parting word on this matter, the Court sees fit to briefly address some ideas and tropes that have been percolating in the national media for the last few months. In interviews, podcasts, and op-eds, people from both inside and outside government have variously accused the courts— myself included—of fomenting a constitutional crisis, usurping the Article II powers of the Presidency, undercutting the popular will, or dictating how Executive agencies can and should be

Add. 018

run.  The subtext, if not the headline, of these accusations is that federal judges are motivated by personal political agendas.  Of course, the media zeitgeist does not—and must not—influence my view of the law, and plays no role in any decision I make as a judge.  However, these circulating notions reflect a fundamental misunderstanding of the role of the federal judiciary, and indeed of the Constitution itself.  So the Court will take this opportunity to clear up some of the misconceptions that are now unfortunately permeating the national mediascape.

For all of the ubiquitous commentary pitting the federal judiciary against the Presidency, the first branch of government—Congress—is often conspicuously absent from these conversations.  It is, after all, *Congress* that makes the laws in this country.  In this case, for example, it was *Congress* who ordained that the monies at issue should be allocated to RFE/RL.

Congress, however, does not make the law by itself.  The Constitution provides that, for a bill to become law, it must be signed by the President.[6]  On March 15, 2025, in accordance with this constitutional design, President Trump signed the very continuing resolution that allocated the funds discussed herein to RFE/RL, as well as Voice of America and the network grantees named in the related *Widakuswara* case.  In other words, the Court did not make the law at the center of these disputes; the people's duly elected representatives, in the legislature and the Oval Office, did that.

What, then, is the Court's proper role in our constitutional system?  Certainly it is not to dictate how best to run the Executive Branch or to subvert the country's political processes. Although I have, in the past, praised the work of Voice of America and RFE/RL, I have no personal stake in the outcome of this case or any of the related cases.  Nor do I have any opinion about how, as a matter of policy, USAGM should be run in the future—or even if it should continue to exist

---

[6]  Or else the President's veto must be overridden by a two-thirds supermajority in each house of Congress.

Add. 019

at all, in light of all the competing demands for taxpayer funding of important programs.  I also have no animosity whatsoever toward this administration or the President, and no loyalty to the plaintiffs.  Indeed, even if I had private sentiments about this dispute or the parties to it, I would not let those sentiments cloud my view of the law; when President Reagan nominated me to this bench in 1987 and the Senate unanimously confirmed my nomination, I swore that I would discharge my duties "without respect to persons . . . faithfully and impartially . . . under the Constitution and laws of the United States."  I am governed by that oath every day.  I am not a political actor, and I have no agenda to press.  I believe that the same is true of my colleagues on the federal bench.

The role of the courts is something far more circumscribed: We interpret the laws and the Constitution and declare what the law is, and we do so *only* when the people or the government call upon us to do so.  We rely on the good faith, cooperation, and trust of the government and the American people to give effect to our interpretations.  Indeed, we could not do otherwise: When our Founding Fathers set about convincing the American people to ratify the Constitution, they pitched the federal judiciary as the branch "least dangerous to the political rights of the Constitution[.]"  The Federalist No. 78 (Alexander Hamilton).  The federal judiciary has no army and no police, lacks the power of the purse, and employs a workforce less than 1% the size of the Executive Branch.[7]  We have no constitutional authorization to legislate, a task assigned to Congress; nor do we have the right or even the means to independently enforce the laws, functions that are solemnly entrusted to the Executive.

---

[7] *Compare* U.S. Courts Annual Report 2021, https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2021#:~:text=Throughout%2C%20we%20also%20stayed%20on,all%20of%20our%2030%2C000%20employemp., *with* The Executive Branch, https://www.whitehouse.gov/government/executive-branch/.

This Opinion, and the related one in *Widakuswara*, reflect my best and most sincere efforts to fulfill my constitutional duty to dispassionately apply the law, as I understand it, to the set of facts the parties have placed before me.  In short: The current Congress and President Trump enacted a law allocating funds to the plaintiffs.  Under the Administrative Procedure Act, actors within the Executive Branch do not have carte blanche to unilaterally change course, withhold funds that the President and the Legislature jointly agreed to spend, and functionally dismantle an agency that the President and Legislature jointly agreed to support.  If the Executive wishes to withhold or reallocate these funds, there is a statutory rescission process in place for them to seek the approval of Congress to do so.  This process assures that the will of the people, expressed through their elected representatives, is borne out.  But the defendants have not followed that process here.  As I see it, if the defendants are aggrieved by these decisions, their problem is not with the Court, but with Congress and the President, and it is with them that the defendants should seek redress.

Reasonable people can reach different conclusions in complicated legal disputes such as this.  That is why we have the Courts of Appeals and the Supreme Court: to hear challenges to judicial decisions, and reverse them if they go astray.  It is also why we have Congress, which—except where the Constitution itself commands otherwise—is free to change the law after a court has ruled.

 "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means . . . to resist encroachments of the others . . . ."  The Federalist No. 51 (James Madison).  By enjoining the defendants' efforts to dismantle the plaintiff networks, actions which I perceive to be contrary to the law, I am humbly fulfilling my small part in this very constitutional

Add. 021

paradigm—a framework that has propelled the United States to heights of greatness, liberty and prosperity unparalleled in the history of the world for nearly 250 years. If our nation is to thrive for another 250 years, each co-equal branch of government must be willing to courageously exert the authority entrusted to it by our Founders.

Therefore, upon consideration of the plaintiff's Motion [ECF No. 28] for a Temporary Restraining Order, the defendants' Opposition thereto, the plaintiff's Reply, and the entire record herein, it is hereby

**ORDERED** that the plaintiff's Motion for a Temporary Restraining Order is **GRANTED**; and it is further

**ORDERED** that Defendants are enjoined to immediately enter into a grant agreement with Plaintiff covering April 2025 under the same terms and conditions applicable to the most recent master grant agreement between the parties, in materially identical terms to the agreement between the parties pertaining to March 2025; and it is further

**ORDERED** that Defendants are enjoined to immediately disburse RFE/RL's April funding in the amount of $12,178,590; and it is further

**ORDERED** that Defendants file a status report within 48 hours of the issuance of this Order, on May 1, 2025, apprising the Court of the status of their compliance with this Order, including documentation sufficient to show the disbursement to Plaintiff of the funds Congress appropriated through April 30, 2025.

**IT IS SO ORDERED.**

Date: April 29, 2025
4:35 p.m.

Royce C. Lamberth
United States District Judge

22

Add. 022