# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RFE/RL, INC.,
*Plaintiff-Appellee,*

v.

KARI LAKE, *et al.*,
*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the District of Columbia,
No. 1:25-cv-799
The Hon. Royce C. Lamberth, U.S. District Judge

## RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR AN ADMINISTRATIVE STAY AND STAY PENDING APPEAL; AND EMERGENCY MOTION FOR EXPEDITED CONSIDERATION

David M. Zionts
Marney L. Cheek
Thomas Brugato
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
dzionts@cov.com

*Counsel for Plaintiff-Appellee
RFE/RL, Inc.*

May 1, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.     Parties

All parties appearing before the district court and in this Court are listed in the Brief for Defendants-Appellants.

## II.    Ruling under review

The ruling at issue is attached to the Brief for Defendants-Appellants.

## III.   Related cases

This case has not previously been before this Court.

There are five related cases currently pending in the United States District Court for the District of Columbia or this Court. *See Open Technology Fund v. Lake*, No. 25-cv-840-RCL (D.D.C.); *Abramowitz v. Lake*, No. 25-cv-887-RCL (D.D.C.), *appeal docketed* (D.C. Cir. No. 25-5145); *Radio Free Asia v. United States of America*, No. 25-cv-907-RCL (D.D.C.), *appeal docketed* (D.C. Cir. No. 25-5151); *Middle East Broadcasting Networks, Inc. v. United States of America*, No. 25-cv-966-RCL (D.D.C.), *appeal docketed* (D.C. Cir. No. 25-5150); *Widakuswara v. Lake*, No. 25-cv-1015-RCL (D.D.C.), *appeal docketed* (D.C. Cir. No. 25-5144).

May 1, 2025

/s/ David M. Zionts
David M. Zionts

*Counsel for Plaintiff-Appellee*
*RFE/RL, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, I state that RFE/RL, Inc. has no parent company and that no publicly held company has a 10% or greater ownership interest in RFE/RL, Inc.


May 1, 2025

*/s/ David M. Zionts*
David M. Zionts

*Counsel for Plaintiff-Appellee*
*RFE/RL, Inc.*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ............................................................i

CORPORATE DISCLOSURE STATEMENT .......................................... iii

TABLE OF CONTENTS .....................................................................iv

GLOSSARY OF ABBREVIATIONS ........................................................ v

INTRODUCTION...............................................................................1

STATEMENT ....................................................................................4

    A.  RFE/RL Is an Independent Nonprofit Funded by Congress. ........4

    B.  USAGM Terminates RFE/RL's Grant and Withholds Funding;
    RFE/RL Sues. ..........................................................................6

    C.  Putative "Negotiations" Over a New Grant Agreement...............7

ARGUMENT .....................................................................................12

   I.  Defendants Are Not Likely to Succeed on the Merits. ..................13

    A.  The District Court Had Jurisdiction...........................................13

    B.  Defendants' Rejection Of A Short-Term Extension Agreement
    For April Is Final Agency Action. .............................................18

  II.  The Remaining Stay Factors Compel Denying Any Stay. ............24

CONCLUSION ..................................................................................27

CERTIFICATE OF COMPLIANCE........................................................28

CERTIFICATE OF SERVICE................................................................29

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CFC | Court of Federal Claims |
| FY | Fiscal Year |
| RFE/RL | Radio Free Europe / Radio Liberty |
| USAGM | United States Agency for Global Media |

**INTRODUCTION**

The district court entered an exceedingly modest, but urgently necessary, order. All Defendants must do is enter into a one-month agreement with Radio Free Europe / Radio Liberty ("RFE/RL") that is materially identical to an agreement *they proposed* for the previous month, and then disburse $12 million that Congress specifically ordered them to allocate to RFE/RL. The government loses nothing by disbursing "taxpayer money" (Mot. 2) to the specific recipient directed by the taxpayers' representatives. Nor is it conceivably harmed by disbursing funds for one more month under the exact same terms and conditions that have long been in effect. In short, Defendants have been ordered to do nothing more than temporarily preserve the status quo while a preliminary injunction motion remains pending.

For RFE/RL, by contrast, the consequences of a stay—even an administrative stay—would be catastrophic. RFE/RL delivers critical journalism in 27 languages and 23 countries where freedom of the press is at its weakest. RFE/RL has *already* had to stop programming and terminate freelance reporting relationships as a consequence of Defendants' actions. Today it has had to miss several lease payments,

and, if this Court grants the requested stay, RFE/RL will have to furlough an additional 100 to 200 employees. Every day it continues to be starved of its congressionally appropriated funds it comes closer to going completely dark for the first time in three quarters of a century. The equities overwhelmingly favor denial of a stay.

And if the balance of equities is lopsided, on the law there is virtually no contest. For two months, Defendants have been casting about for ways to avoid following Congress's direction to allocate specific funds to RFE/RL. First they terminated its grant for no reason other than a change in agency "priorities," then reversed course after RFE/RL sued. Next, seizing on the fact that they had delayed signing a master grant agreement for Fiscal Year 2025, Defendants loaded the agreement with flagrantly unlawful, unreasonable, and impossible-to-comply-with provisions. Just one example: they demanded authority to remove RFE/RL's entire Board of Directors, even though Congress had recently *repealed* the agency's one-time authority to arrogate to itself such a power through grant conditions. *See* ECF 41-1 at 28-29. In short, Defendants presented a false choice: heads, we win (RFE/RL refuses the conditions, gets no grant, gets no funds); tails, you lose (RFE/RL accepts the

conditions, is promptly in default and/or loses control of its own Board, gets no funds). Defendants have not once defended the legality or reasonableness of these new conditions.

Instead, they insisted those conditions were not reviewable because the parties could negotiate. So RFE/RL tried to negotiate—but Defendants stonewalled. Under these circumstances, the very least Defendants could have done was agree to a one-month extension agreement for April and disburse RFE/RL's April funds. That way, if Defendants were really interested in negotiating, they could do so without holding a proverbial gun to RFE/RL's head.

All the district court has decided so far is that Defendants' rejection of that modest request was arbitrary and capricious. This Court should not stay that exceedingly narrow order, and should not thereby free Defendants to cause exceedingly serious harm.

*** 

The district court entered its order at approximately 4:45pm on April 29, and ordered Defendants to provide documentation of their compliance within 48 hours. Defendants waited approximately 46 hours to seek emergency relief from this Court. RFE/RL is accordingly filing

its opposition within a few hours of receiving Defendants' motion. Given the circumstances, it respectfully asks this Court to expedite its decision and resolve the motion tonight or as early as possible tomorrow. Defendants represent that funds can be released "as early as tomorrow morning" (Mot. 1), and have informed the district court that absent a stay, they "anticipate that the funds will be disbursed by the Treasury to Plaintiff on May 2, 2025." ECF 51 at 2. RFE/RL respectfully asks this Court to act in such a way that this schedule is unaffected.

Defendants have informed RFE/RL that they do not intend to file a reply brief before tomorrow, and they request that the Court determine whether to grant interim relief based on their motion and RFE/RL's opposition; if the Court orders Defendants to file a reply brief, Defendants will file on any schedule set by the Court.

## STATEMENT

### A. RFE/RL Is an Independent Nonprofit Funded by Congress.

For seventy-five years, RFE/RL has existed as an independent nonprofit organization broadcasting free and independent news. Add.002

¶¶ 2-3.[1]  Before Defendants began withholding RFE/RL's congressionally appropriated funds, RFE/RL reached more than 47 million people. Add.002 ¶ 3.  RFE/RL had over 1,300 employees and approximately 1,000 freelance journalists carrying out the complex, often dangerous, work of reporting to countries where a free press is threatened.  Add.003 ¶ 9.

Congressional appropriations comprise approximately 99% of RFE/RL's funding.  Add.003 ¶ 12.  The International Broadcasting Act of 1994 mandates that the United States Agency for Global Media ("USAGM") "shall" "make annual grants" to RFE/RL.  Pub. L. No. 103-236, 108 Stat. 382, 437 (1994) (codified as amended at 22 U.S.C. § 6207(f)).  It also provides that RFE/RL's grant "shall only be made in compliance with a grant agreement."  22 U.S.C. § 6207(g).  The current form of the RFE/RL's grant agreement has been in place since 2011, with minor changes year to year.  Add.028 ¶ 2.

Congress has appropriated funds for RFE/RL every year since 1973. Add.003 ¶ 11.  Currently, Congress has specifically allocated to RFE/RL $77 million covering March 1 to September 30, 2025.  Add.004 ¶ 20.

---

[1] Citations to the addendum attached to this opposition are to "Add." Citations to the addendum attached to Defendants' motion are to "Stay.Add."  ECF references are to the district court docket.

Despite the statutory obligation to make a grant to RFE/RL and allocate specific sums to it, USAGM has steadfastly refused to provide RFE/RL its April 2025 funds.

If RFE/RL does not promptly receive its long-overdue April funds, it will be forced to wind down the vast majority of its operations this month, effectively ending the organization's existence. Add.032 ¶ 28. This will include terminating its relationships with the rest of its freelance journalists, terminating its leases and contracts, and laying off staff. Add.005 ¶¶ 23-24. RFE/RL has already been forced to significantly scale back its operations due to Defendants' failure to disburse its appropriated funds. Add.005 ¶¶ 23-24; Add.018-019 ¶¶ 3-8; Add.032 ¶¶ 21-24.

## B. USAGM Terminates RFE/RL's Grant and Withholds Funding; RFE/RL Sues.

The last fully executed, full-year Master Grant Agreement between RFE/RL and USAGM is the FY 2024 Master Grant Agreement. *See* Add.024 ¶ 3. USAGM subsequently executed short "extender" agreements obligating RFE/RL's appropriated funds through February 28, 2025, under the same terms and conditions. Add.004 ¶ 18; *see also* Add.024 ¶¶ 4-5.

In February 2025, USAGM and RFE/RL negotiated the FY 2025 Master Grant Agreement, which USAGM instructed RFE/RL to sign. Add.0244 ¶ 6. After RFE/RL did so, USAGM went silent.

On March 15, Defendant Kari Lake, Senior Advisor to the Acting CEO of USAGM, sent a letter to RFE/RL purporting to terminate RFE/RL's grant. Add.004 ¶ 21; Letter from Kari Lake to RFE/RL (Mar. 15, 2025), Add.009-010. According to Defendant Lake, RFE/RL's grant "no longer effectuates agency priorities," citing an executive order directing USAGM to wind down its non-statutory functions. Add.009. Defendant Lake provided no further explanation.

RFE/RL sued. In response to the litigation, USAGM withdrew the termination of RFE/RL's grant agreement. ECF 15. USAGM then disbursed RFE/RL's March 15-31 funding and sent RFE/RL another "extender" grant agreement for March. Add.025 ¶¶ 9, 12. RFE/RL continued to inquire about the status of RFE/RL's April funding, which RFE/RL urgently needed, but USAGM was silent. *See* Add.040-045.

## C. Putative "Negotiations" Over a New Grant Agreement

On April 9, USAGM presented RFE/RL with "the RFE/RL FY-25 Master Grant Agreement" ("Grant Agreement"). *See* Add.022. USAGM

demanded that RFE/RL "provide a signed version of this Grant Agreement" to receive its April funding. *Id.* But the Grant Agreement—unlike the FY 2024 Master Grant Agreement, or the FY 2025 Master Grant Agreement that RFE/RL signed in February—contained numerous unprecedented terms and conditions that would effectively allow USAGM to seize control of RFE/RL and shut it down. For example, the Grant Agreement gives USAGM the authority to approve and remove members of RFE/RL's Board of Directors—an authority that Congress expressly removed from the International Broadcasting Act in 2022. *See* ECF 28-3 at 6; *see also* ECF 41-1 at 36-38. It also contains a number of conditions that are impossible to comply with. ECF 28-3 at 6-7; *see* ECF 41-1.

Here is how the "negotiations" over this agreement have gone:

1. As noted, in February 2025 the parties conducted a normal negotiating process over less than two weeks and reached agreement, but USAGM never returned a countersigned agreement. Add.024-025 ¶¶ 6-7.

2. On March 15, Defendants terminated RFE/RL's grant, Add.009, and on March 26, Defendants rescinded that termination, ECF 15 at 4. The parties promptly agreed to an "extender" applying to March

the terms and conditions that were previously in effect so that the remainder of RFE/RL's March funds could be disbursed.  *See* Add.025 ¶ 9.

3. For the next two weeks, USAGM refused to engage with RFE/RL on the full-year FY 2025 agreement.

4. On April 9, USAGM transmitted to RFE/RL "the" grant agreement for FY 2025 and demanded that RFE/RL sign it.  *See* Add.022. That agreement added a host of unlawful and unreasonable provisions— in effect, poison pills—which Defendants still have not justified or explained.  Because of the egregiousness of these terms and its need for April funds, RFE/RL filed a motion for a temporary restraining order.

5. Also on April 9, RFE/RL requested to speak with USAGM to clarify.  Add.025 ¶ 13.  USAGM never responded.  *Id.*

6. On April 15, nearly a week later and still without a response, RFE/RL again sought to engage USAGM, after a status conference where the district court urged the parties to negotiate.  Add.035 ¶ 2.  RFE/RL asked USAGM to sign the agreement the parties had negotiated in February.  Add.042.  RFE/RL asked, alternatively, for a one-month "extender" for April.  Add.043.  Finally, RFE/RL asked USAGM to agree

to delete six particularly egregious provisions of the new agreement, as a sign of its willingness to negotiate. Add.043-044.

7. To this day, USAGM has not responded to RFE/RL's request to sign the previously negotiated agreement, or to enter into an April "extender." *See generally* Add.037-046.; Add.035 ¶ 2.

8. Instead, on April 15, USAGM sent a cursory response requesting a redline version with "specific edits RFE/RL is seeking." Add.041. RFE/RL promptly sent a redline on April 16. App.040-041.

9. USAGM responded the same day with a rejection of every change RFE/RL requested. Add.039-040. It "maintain[ed] that its language is reasonable," without explanation. Add.040. It stated only that it was willing to change certain 24-hour deadlines to 14-day deadlines. *Id.* USAGM also asked for an explanation of why its condition giving USAGM power over RFE/RL's board is illegal. Add.040.

10. RFE/RL responded the same day. Add.037-39. It explained why USAGM lacks authority to demand a condition giving it the power to determine RFE/RL's board. Add.037-39. RFE/RL offered additional explanation of why several other provisions are unreasonable, and asked

USAGM to explain what has changed since February that necessitates these new conditions.  Add.037-39.

11. In the same communication, RFE/RL noted USAGM's continued non-response to its request for an "extender" covering April.  Add.039.  RFE/RL stated its understanding that USAGM had rejected that request, and asked USAGM to "let us know if we are mistaken."  Add.039.  USAGM never disputed that it had rejected this request.

12. USAGM then went *eight days* without responding, despite being well aware of RFE/RL's desperate need for funding.

13. When USAGM finally responded on April 24, it attached a new version of the grant agreement that retained nearly all of the objectionable language.  Add.048; ECF 42-2.  USAGM did not respond to RFE/RL's concerns about the retained language, and it did not explain why USAGM considered necessary or appropriate the terms to which RFE/RL had objected.  USAGM said nothing at all of substance about the agreement; it said only that "[w]e will use this version going forward."  Add.048.

Given the absence of any meaningful negotiation by USAGM, and its deafening silence regarding RFE/RL's request for an April "extender"

agreement, the district court proceeded with hearing RFE/RL's temporary restraining order and preliminary injunction motions. On April 29, the district court granted a temporary restraining order. ECF 48. It ordered USAGM to "immediately disburse RFE/RL's April funding in the amount of $12,178,590" and "immediately enter into a grant agreement with [RFE/RL] covering April 2025 under the same terms and conditions applicable to the most recent master grant agreement between the parties, in materially identical terms to the agreement between the parties pertaining to March 2025." Stay.Add.022.

Nearly two full days later, Defendants moved this Court for a stay of the district court's order.

## ARGUMENT

"A stay pending appeal is an 'extraordinary' remedy." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (citation omitted). Four factors apply: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted).

## I.     Defendants Are Not Likely to Succeed on the Merits.

### A.     The District Court Had Jurisdiction.

After leading with a non-jurisdictional argument, Defendants halfheartedly argue that the district court lacked jurisdiction. They say that the Tucker Act vested exclusive jurisdiction in the Court of Federal Claims ("CFC"). But the CFC has jurisdiction over claims "founded … upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). Thus, the question is whether RFE/RL's "claim is essentially a contract action." *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004).

This is obviously not a contract action *because there is no contract*. As the government has taken pains to point out, RFE/RL has "not yet entered into a grant agreement." Defs.' Emergency Motion for Administrative Stay and Stay Pending Appeal ("Mot.") 13. "To invoke the [CFC's] jurisdiction," a plaintiff must "allege the existence of a contract as a basis for relief," *Brach v. United States*, 443 F. App'x 543, 546 (Fed. Cir. 2011) (citation omitted), which RFE/RL cannot do here.

Indeed, the government recently told this Court that "[i]f no grant agreement existed, then the grantees could make a statutory argument about why they are entitled to a grant in the first place," appearing to acknowledge that such a claim would belong in district court. Defs.' Reply Supp. Mot. for Stay at 3, *Widakuswara v. Lake*, No. 25-5144 (D.C. Cir. filed Apr. 29, 2025). That is *exactly* what RFE/RL claims here: that Defendants are breaking the law by refusing to enter into a lawful and reasonable grant agreement.

The "source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)," confirm the district court's jurisdiction. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citation omitted).

***Source of rights.*** The jurisdictional question "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *abrogated in part on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017). "Crucially," this Court explained,

"litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.* at 610.

As noted, this case is not even complicated by "the presence of a contract," so it could not be clearer that RFE/RL's claims "stem from a statute." *Id.* at 609. Specifically, RFE/RL claims that Defendants have:

- violated their statutory obligation to make a grant "available," 22 U.S.C. § 6207(f), by refusing a grant unless RFE/RL accepts unworkable and impossible-to-comply-with poison pills;

- violated their statutory obligation to "respect" RFE/RL's "professional independence and integrity," *id.* § 6204(b), by insisting on unprecedented micromanagement of its operations;

- exceeded the statutory limits on their authority, including by insisting on the power to determine RFE/RL's Board of Directors—a power Congress *specifically repealed*, *see supra* p.2;

- violated the APA by unreasonably, and without explanation, refusing to enter into a short-term extension agreement for April to allow breathing space to negotiate a *bona fide* grant agreement;

- and through these actions, violated their statutory duty to allocate to RFE/RL funds specifically appropriated for it, *see supra* p.5.

Jurisdiction does not turn on whether RFE/RL is right on the merits—though Defendants notably avoid defending the merits. The

question is the source of rights on which RFE/RL "bases" its "claims." *Crowley*, 38 F.4th at 1106 (citation omitted).  Plainly, RFE/RL bases its claims on the International Broadcasting Act and the APA.

*Relief sought.*  "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  RFE/RL does not seek "money damages" as a *substitute* for a suffered loss."  *Id.* at 895 (emphasis in original) (citation omitted).  It seeks "the very thing to which [it] [is] entitled," *id.* (citation omitted): a lawful grant agreement and its congressionally appropriated funds.

Defendants' argument to the contrary is incoherent: it says RFE/RL "is seeking the 'the classic contractual remedy of specific performance' but without an existing contract."  ECF 44 at 14.  But that classic remedy is "specific performance *of a contract duty*."  Restatement (Second) of Contracts § 357 (emphasis added) (AM. L. INST. 1981).  There is no such thing as specific performance of a non-contractual duty.  RFE/RL seeks what it claims it is entitled to by law.

*Precedent.*  This Court has reviewed under the APA agency actions requiring contractual terms, *see SecurityPoint Holdings, Inc. v. Transp.*

*Sec. Admin.*, 769 F.3d 1184, 1186-87 (D.C. Cir. 2014), and an agency's "negotiation of a contract," *Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983). Several other circuits have reviewed under the APA an agency's imposition of grant conditions. *See City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019); *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 283-84 (3d Cir. 2019); *City of Providence v. Barr*, 954 F.3d 23, 31-32 (1st Cir. 2020); *State v. Dep't of Just.*, 951 F.3d 84, 100-01 (2d Cir. 2020). On the government's theory, every one of these cases should have been dismissed for lack of jurisdiction, yet the government in these cases did not even "contest jurisdiction," *SecurityPoint*, 769 F.3d at 1187, underscoring how frivolous its present argument is.

Defendants' reliance on *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), is misplaced. *California* involved a statutory authorization for the Education Department to "use certain funds to make grants," without giving any specific entity a statutory right to receive a grant. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 95 (1st Cir. 2025) (citations omitted). Accordingly, the government stressed that "[t]he ultimate source of the grantees' asserted right to payment is *the grant award*s, not the grantmaking statutes[.]" App. to Vacate,

*California*, No. 24A910, 2025 WL 945313, at *16 (U.S. filed Mar. 26, 2025) (emphasis added) (citation omitted). And the Supreme Court agreed that a district court could not "enforce a contractual obligation to pay money along the lines of what the District Court ordered [in that case]." *California*, 145 S. Ct. at 968 (internal quotation marks and citation omitted). Here, again, the district court did not and could not "enforce a contractual obligation" *because there is no contract*—it reviewed an agency action refusing to enter into a contract in the first place, based on a claim that this action was unlawful, arbitrary, and capricious. And even if there were a contract in place, a refusal by Defendants to disburse *congressionally appropriated funds* as *specifically directed by Congress* can be redressed by an order enforcing statutory obligations, not contractual ones.

### B. Defendants' Rejection Of A Short-Term Extension Agreement For April Is Final Agency Action.

Defendants' principal argument on appeal—disputing final agency action—is unlikely to succeed for a simple threshold reason: Defendants have forfeited it. "[T]he requirement of 'final agency action' is not jurisdictional," and thus waivable. *John Doe, Inc. v. DEA*, 484 F.3d 561, 565 (D.C. Cir. 2007). In the district court, RFE/RL specifically argued

that "Defendants' unexplained refusal" to enter into a one-month agreement for April "is itself arbitrary and capricious" agency action. ECF 41-1 at 2; *see also* ECF 42 at 2 (this refusal "is plainly reviewable final agency action at this point"). Defendants' opposition brief did not dispute that this was final agency action. *See generally* ECF 44. That is reason enough to conclude that Defendants' appeal is not likely to succeed.

Regardless, Defendants' rejection of an April extension agreement was final. Shortly after Defendants presented their long list of new conditions for the master grant agreement, RFE/RL asked the agency to enter into a one-month agreement on the same terms as the one-month March agreement. Add.043. Defendants responded to that communication without acknowledging the request. Add.041. So RFE/RL followed up, noting its understanding that USAGM had rejected this request, and asked USAGM to "let us know if we are mistaken." Add.039. Defendants did not respond at all for eight days. When they finally did, they did not question RFE/RL's understanding, or say anything at all about the request to enter into an April agreement.

Add.048. On this record, there is no question that the agency refused RFE/RL's request to enter into an April agreement.

That refusal is unquestionably "agency action." Agency action includes a "denial" of "relief," and "relief" includes a "grant of money" and any other "action on the application of … a person." 5 U.S.C. § 551(11), (13). Defendants denied RFE/RL a grant that it had requested: a short-term grant for April under the same terms and conditions as the parties' March agreement.

That agency action was also final. It "mark[ed] the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). RFE/RL specifically asked Defendants to correct the record if they had *not* decided to deny an April agreement, and they did not. And that decision was one "from which legal consequences will flow," *id.* at 178: RFE/RL's congressionally appropriated funds must be disbursed pursuant to a grant, so the denial of the requested grant is what stands between RFE/RL and its appropriated funds for April, *see Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 543 (D.C. Cir. 2016).

This Court's decision in *SecurityPoint* is again dispositive. There, the agency sent contracting parties a "[Memorandum of Understanding] template" making certain changes. 769 F.3d at 1186-87. SecurityPoint sent two letters opposing the changes. *Id.* at 1187. The agency's chief counsel responded in a letter adhering to the agency's changes to the contractual language, but "not address[ing]" SecurityPoint's key contentions, which constituted final agency action. *Id.* at 1187-88. Thus, when a party asks an agency for an agreement under one set of terms and conditions, but the agency will only enter the agreement under different terms and conditions, that is final agency action.

Defendants concede "the Agency's non-response to requests for a temporary agreement for April 2025." Mot. 16. Instead they argue that the district court missed the "context" that these requests "occurred as part of negotiations." *Id.* As an initial matter, it is farcical for Defendants to say they were engaged in *bona fide* "active" and "ongoing" negotiations. Mot. 2, 13, 17, 23-24. *See supra* pp. 5-10.

More importantly, the context only *confirms* that Defendants' repeated non-response constituted a denial of an April agreement. With a third of the month of April already elapsed, and RFE/RL lacking its

grant funding for that month, Defendants unveiled a litany of unprecedented conditions. As they have never disputed, that list included provisions RFE/RL could not possibly satisfy (and thus appeared engineered to put RFE/RL in material breach), and one momentous condition concerning RFE/RL's Board that Congress already decided the agency lacked authority to impose. *See* ECF 41-1 at 36-38. RFE/RL repeatedly asked Defendants to remove the key problematic conditions, but they would not budge or even discuss them. Defendants would go silent for more than a week at a time, and come the end of April *still* had not engaged in an actual negotiation over the problematic conditions RFE/RL had highlighted. *See supra* pp. 9-10.

*That* is the context for Defendants' repeated non-response to RFE/RL's request for an April extension agreement. RFE/RL specifically explained that an extension agreement was needed to allow breathing space for an actual negotiation. ECF 46-1 at 5. As Defendants well knew, RFE/RL was already shutting down operations, preparing to furlough more employees and miss lease payments on May 1, and close to being forced to go dark. *Id.* at 8. Forget negotiations with a "thumb on the scale," Mot. 24; by denying an April extension agreement, Defendants

insisted that RFE/RL negotiate with a gun to its head. And if any more context is needed, it is that the district court did not rule until April was nearly *over*—RFE/RL generally receives its funding at the start of the month in question, and here April was ending without any response to RFE/RL's request for an agreement covering its April funding and operations. It is hard to understand how a refusal to enter an April agreement could be anything but final when April is over.

This Court applies a "pragmatic and flexible approach" to the final agency action question. *Friedman*, 841 F.3d at 543 (internal quotation marks omitted). In identifying such action under the extraordinary circumstances presented here, the district court did not hold that "every failure to respond to specific questions, offers, or requests" is reviewable. Mot. 16. What the district court found reviewable was the clear rejection of a request that was repeated multiple times, in urgent circumstances of the agency's own creation, where the denial of relief had immediate and serious consequences. The implications of Defendants' argument, meanwhile, are astonishing. In their view, if a party with a *statutory entitlement to a grant* requests a grant agreement, the agency can simply ignore it—to the point that the congressionally intended grantee simply

dies from lack of funding—without the agency having ever done anything "final."

Since Defendants' denial of an April agreement was unmistakable, their arguments about "inaction" are beside the point. Mot. 17-18. In any event, this Court does not distinguish agency action from "inaction that has precisely the same impact on the rights of the parties as denial of relief." *Friedman*, 841 F.3d at 543 (brackets omitted). If what happened here was "inaction," it had precisely the same impact on RFE/RL as an outright denial: the month of April came and went without a genuine grant agreement, preventing RFE/RL from receiving the funds Congress allocated to it, and putting it on the precipice of destruction.

## II. The Remaining Stay Factors Compel Denying Any Stay.

1. The equities here are clear. If the Court grants a stay, RFE/RL will be forced to wind down its operations in May 2025 and ultimately cease to exist before the Court can decide this case on the merits. The undisputed evidence makes clear that if RFE/RL does not promptly receive additional funding, it "will have no choice but to close down the vast majority of the organization in May 2025." Add.032 ¶ 28. This includes furloughing additional employees, cancelling remaining

contracts, halting broadcasting operations, missing lease payments, and more. Add.032 ¶¶ 21-28. RFE/RL and its journalists also face severe threats to their physical security and cybersecurity arising from the lack of April funding. Add.012-14 ¶¶ 3-15. The district court correctly found that this "significant and comprehensive showing" of harm arising from the failure to provide RFE/RL its April funds "threaten[s] the very existence of [the] business." Stay.Add.017.

Defendants simply ignore this evidence in asserting that this is a mere "monetary" injury. Mot. 25. "A business's destruction in its current form commonly qualifies as irreparable harm." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (internal quotation marks omitted). Defendants' other suggestion, that RFE/RL can agree to Defendants' grant agreement, ignores that the agreement contains numerous unlawful and unreasonable provisions (a proposition Defendants have never meaningfully disputed) and that Defendants have refused to negotiate or even explain these provisions. *See* Add.035 ¶¶ 2-4; *see also* Add.036-55.

2. In contrast, the government will suffer no harm by providing RFE/RL its congressionally appropriated funds for April. There is no

dispute that RFE/RL is entitled to those funds; Defendants have yet to explain how distributing funds as Congress mandated would harm the government. And unlike in *California*, RFE/RL does not "have the financial wherewithal to keep [its] programs running" while this Court adjudicates the merits. *California*, 145 S. Ct. at 969.

3. The public interest also favors RFE/RL. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). By contrast, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation omitted). Likewise, "[t]he public has an interest in assuring that public funds are appropriated and distributed pursuant to Congressional directives." *Population Inst. v. McPherson*, 797 F.2d 1062, 1082 (D.C. Cir. 1986). Finally, as the district court found, Congress has specifically identified the continued funding of RFE/RL as being in the public interest. Stay.Add.017. None of this is overcome by Defendants' utterly bare assertion that it does not "think" the terms used in March 2025, and for a long time before that, are "appropriate." Mot. 2.

## CONCLUSION

The Court should deny a stay.

May 1, 2025

Respectfully submitted,

*/s/ David M. Zionts*
David M. Zionts
Marney L. Cheek
Thomas Brugato
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
dzionts@cov.com

*Counsel for Plaintiff-Appellee*
*RFE/RL, Inc.*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,045 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Cir. Rule 32(e)(1). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in Microsoft Word using proportionally spaced, 14-point Century Schoolbook font.

May 1, 2025

*/s/ David M. Zionts*
David M. Zionts
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
dzionts@cov.com

*Counsel for Plaintiff-Appellee
RFE/RL, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on May 1, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

May 1, 2025

*/s/ David M. Zionts*
David M. Zionts
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-600
dzionts@cov.com

*Counsel for Plaintiff-Appellee RFE/RL, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 27(a)(3)(A)**

First Declaration of Stephen Capus, ECF No. 6-3 ........................................Add.001

First Declaration of James Landis, ECF No. 6-4 .........................................Add.011

Supplemental Declaration of Stephen Capus, ECF No. 10-1 ......................Add.017

Email re: RFE/RL FY 2025 Master Grant Agreement (dated April 9, 2025), ECF No. 28-2.........................................................................................Add.021

First Declaration of Joseph Lataille, ECF No. 33-1 ...................................Add.023

Fourth Declaration of Stephen Capus ECF No. 41-2 ..................................Add.027

Second Declaration of Joseph Lataille, ECF No. 41-5.................................Add.034

Correspondence with USAGM, ECF No. 41-6 ............................................Add.036

Correspondence with USAGM, ECF No. 42-1 ...........................................Add.047

# Exhibit A

# Declaration of Stephen Capus

I, Stephen Capus, declare as follows:

1. I am the President and Chief Executive Officer of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO.

2. RFE/RL is a private, not-for-profit organization incorporated in Delaware and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. RFE/RL has its registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and its corporate headquarters at 1250 Connecticut Avenue NW, Suite 450, Washington, D.C. 20036. RFE/RL maintains its journalistic headquarters in Prague, Czech Republic, close to the markets it serves.

**RFE/RL's Background**

3. RFE/RL is a self-governing, independent, nonpartisan, not-for-profit news organization. Over the course of its seventy-five-year existence, RFE/RL has developed into one of the most comprehensive news operations in the world, with reporting in 27 languages to 23 countries that reaches more than 47 million people every week. RFE/RL has been funded by the U.S. government through the United States Agency for Global Media ("USAGM") and its predecessors since RFE/RL's inception.

4. RFE/RL's mission is to promote democratic values by providing accurate, uncensored news and open debate in countries where a free press is threatened and disinformation is pervasive.

5. RFE/RL functions as a "surrogate" broadcaster, which means that it offers full-service news coverage and reporting as an alternative to the local news media, which may be either controlled by the state or otherwise not independent. RFE/RL's journalists provide what many people cannot get locally: uncensored news, responsible discussion, and open debate. RFE/RL's work is based on the conviction that the first requirement of democracy is a well-informed citizenry.

6. The U.S. government conceived of and funded Radio Free Europe and Radio Liberty as separate entities at the beginning of the Cold War. Radio Free Europe first started broadcasting to Poland, Czechoslovakia, Hungary, Romania, and Bulgaria in 1950, while Radio Liberty started broadcasting to the Soviet Union in 1953. Radio Free Europe and Radio Liberty were alternative news sources to the media censored and controlled by the Soviet Union and other communist governments. In 1976, Radio Free Europe and Radio Liberty were consolidated and incorporated into its current form as a single corporate entity.

7. In the 1990s, RFE/RL continued and expanded its operations to respond to threats to democracy and media freedom in Eastern Europe and the former Soviet Union and beyond. After the breakup of Yugoslavia, RFE/RL began broadcasting in Serbian, Croatian, and Bosnian to the Yugoslav successor states. In some countries that established democratic

governments and free media, RFE/RL concluded that it had fulfilled its mission and ceased broadcasting, such as in Poland in 1997. In other cases, RFE/RL expanded its operations such as beginning operations in Persian to reach audiences in Iran in 1998. Today, RFE/RL has adapted from being a broadcast radio service to embracing a multi-channel approach to news, with a news presence online and across social media platforms.

8. It has taken decades for RFE/RL to develop the structure, expertise, and goodwill to operate in almost two dozen countries, many with governments that are unfriendly to the United States, and in multiple specialized languages.

9. Today, RFE/RL has 1,389 employees, including about 900 journalists. RFE/RL also has approximately 1,000 freelancers in 23 countries.

10. Given the sensitivity of its work in countries without a free press or where a free press is not fully established, RFE/RL has faced continuous and significant threats to the physical safety of its journalists and staff, cyberattacks, and threats to its physical facilities. For example, in 1981, a terrorist bomb paid for by Romanian security services exploded at RFE/RL's headquarters (then located in Munich), injuring six people.

**RFE/RL's Funding Structure**

11. Congress first formally established funding for RFE/RL in the International Broadcasting Act of 1973. Since then, Congress has appropriated funding for RFE/RL every year.

12. Approximately 99 percent of RFE/RL's total funding comes from its annual congressional appropriation. The remaining one percent of funds comes from private donations and other sources.

13. Every year, RFE/RL enters into a grant agreement with the United States Agency for Global Media. This process obligates RFE/RL's congressionally appropriated funds.

14. Each year, typically around September 15, USAGM prepares a draft grant agreement and sends it to RFE/RL for review. RFE/RL reviews the terms and proposes minor changes. Simultaneously, USAGM requests, and RFE/RL provides, an annual financial plan with monthly funding requirements. USAGM reviews proposed changes to the plan. Upon agreement, the President and CEO of RFE/RL will then sign the grant agreement on behalf of RFE/RL, and USAGM's CEO will sign the grant agreement on behalf of USAGM. The grant agreement is then fully executed for the year. The monthly financial plan is included as an addendum to the grant agreement.

15. Once the congressionally appropriated funds are obligated, USAGM is responsible for transferring funds to RFE/RL. RFE/RL requests funding monthly on the first day of the month in alignment with the current month's financial plan.

**USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding**

16. On March 23, 2024, Congress appropriated $142,212,000 for RFE/RL in the Further Consolidated Appropriations Act of 2024, P.L. 118-47 for fiscal year 2024. USAGM signed

an amendment to the grant agreement (FAIN: 1060-24-GO-00001) obligating those funds to RFE/RL on July 31, 2024. USAGM also signed an amendment to the grant agreement extending the period of performance for "12 months from the end date of the initial grant period end date of September 30, 2024."

17. On September 26, 2024, Congress passed a continuing resolution appropriating amounts for fiscal year 2025 from October 1, 2024, to December 20, 2024, at the funding levels for fiscal year 2024. As a proportion of the fiscal year 2024 level specified ($142,212,000), the appropriated amount approximated an additional $23 million for RFE/RL. USAGM subsequently executed a grant agreement (FAIN: 1060-25-GO-00001) on October 15, 2024, obligating $23,077,270 for RFE/RL through December 20, 2024.

18. On December 21, 2024, Congress passed another continuing resolution appropriating amounts for fiscal year 2025 from December 21, 2024, to March 14, 2025, at the funding levels for fiscal year 2024. As a proportion of the fiscal year 2024 level specified ($142,212,000), the appropriated amount approximated an additional $41 million for RFE/RL. USAGM subsequently executed a grant agreement (FAIN: 1060-25-GO-00001) on December 31, 2024, obligating $34,004,153 of the appropriated amount to RFE/RL through February 28, 2025. This agreement extended the period of performance to March 14, 2025. USAGM did not, however, obligate $7,464,559 to RFE/RL from the congressional appropriation for the period of March 1-14, 2025. In December 2024, USAGM stated that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees, and that it would provide funds for that period once funds for all of March had been appropriated. On March 17, after the period of performance under this specific agreement had passed, RFE/RL sent USAGM an invoice demanding payment of the $7,464,559 that Congress appropriated for the period of March 1-14, 2025, and that USAGM still has not transferred to RFE/RL.

19. USAGM initiated its usual process for executing the grant agreement with RFE/RL by sharing a draft copy of the 2025 grant agreement. From February 14 to February 27, USAGM and RFE/RL exchanged minor edits to the grant agreement. On February 27, the USAGM Budget Director said that she would send "a signable file ASAP" and indicated RFE/RL would sign first. USAGM followed up with the finalized 2025 grant agreement and requested a "*signed* version of this Master Grant Agreement at your earliest convenience." That same day, RFE/RL signed the agreement and sent it back to USAGM for USAGM's signature. On February 28, USAGM confirmed that they had received the signed agreement. USAGM, however, never returned the countersigned agreement to RFE/RL.

20. On March 14, 2025, Congress passed a continuing resolution appropriating funding for RFE/RL from March 15, 2025 to September 30, 2025 at the same levels as fiscal year 2024. As a proportion of the fiscal year 2024 level specified ($142,212,000), the appropriated amount approximated $77 million for RFE/RL.

21. On March 15, 2025, RFE/RL received a letter from Kari Lake, Senior Advisor to the Acting CEO of USAGM, purporting to terminate RFE/RL's grant agreement. A true and correct copy of this letter is attached as Exhibit 1.

22. This letter indicated that USAGM would not obligate the outstanding March 1-14, 2025 funds and would not obligate or disburse the appropriated funds for the remainder of fiscal year 2025. *See* Exhibit 1. The total outstanding amount that Congress has appropriated to RFE/RL but that USAGM has refused to provide is $85,130,577. USAGM's refusal to disburse funds in this manner is without precedent in RFE/RL's long history.

**Without Appropriated Funds, RFE/RL Will Be Forced to Wind Down**

23. Due to the lack of funding for March, RFE/RL has had to begin the process of winding down its operations. Absent any additional funding, RFE/RL will have no choice but to close down the vast majority of the organization in April 2025. This process will involve terminating all the organization's contracts with freelance journalists, terminating RFE/RL's leases and contracts, and laying off staff. Without its congressionally appropriated funds, RFE/RL will be forced to stop the vast majority of its journalistic work and may ultimately cease to exist as an organization.

24. RFE/RL is already closing an office in Almaty, Kazakhstan and has terminated freelancers across its broadcast region because USAGM has withheld funding since March 1.

**Immediate Impact of USAGM's Refusal to Provide Appropriated Funds**

25. First, failing to provide RFE/RL its congressionally appropriated funding will interfere with RFE/RL's mission by requiring it to halt essentially all broadcasting and news operations. RFE/RL reaches over 47 million people every week. Stopping news coverage in countries where there may be few, if any, other alternative news source apart from state-controlled or state-influenced media means that millions of people will be cut off from access to free and independent media coverage of critical events. This will irrevocably harm RFE/RL's reputation and credibility with the millions of people that rely on RFE/RL for news.

26. Second, RFE/RL's loss of funding will have a devastating impact on its reporters around the world. RFE/RL collaborates with freelance journalists who report from some of the countries most hostile to independent reporting in the world, such as Iran, Russia, and Uzbekistan. Recruiting freelance journalists in these countries is extraordinarily challenging due to the personal and professional risks involved. RFE/RL has spent decades developing relationships with local freelance journalists and organizations and has established a reputation as a reliable and secure broadcaster of independent news. Terminating these contracts will undermine RFE/RL's reputation as a reliable partner, and for some of these freelance journalists RFE/RL may not be able to reestablish contact or recruit the same journalists again.

27. Many of RFE/RL's journalists and staff are unable to work in their home countries due to security issues arising from their journalism, so they are working on visas outside of their home countries. In many countries where RFE/RL operates, our employees' residency is based on their work for RFE/RL. RFE/RL's loss of funding means that these journalists will lose their employment status, putting these journalists at imminent risk of losing their work visas, leading to deportation.

28. For example, many of RFE/RL's over three hundred exiled Russian journalists operate from Prague, Riga, and Vilnius, with work visas tied to RFE/RL employment. Funding termination

4

would trigger visa expirations (e.g., the Czech Foreign Nationals Act mandates employment for renewals).  Deportation to Russia could follow, exposing them to criminal prosecution and possible imprisonment and torture.

29. RFE/RL has 160 staff members working for Current Time, RFE/RL's 24/7 Russian-language TV network, including twelve citizens of Belarus, seven of whom work in Lithuania.  Current Time's Belarusian staff, broadcasting to a nation aligned with Russia since the 2020-2021 media crackdown, risk cross-border rendition if expelled from Lithuania.  Two of our journalists are currently languishing in Belarusian prisons because of their work for RFE/RL.

30. Our journalists, marked by their RFE/RL tenure, cannot secure alternative local employment in host countries wary of Russian retaliation.  For example, TV Rain (also known as Dozhd TV), a Russian independent television station, was effectively expelled from Latvia in 2022. Latvia's state broadcasting regulator, the National Electronic Mass Media Council (NEPLP), canceled TV Rain's broadcasting license in Latvia and branded the channel a "threat to national security" due to concerns over its content and potential alignment with Russian interests, despite its independent status.

31. Third, RFE/RL's loss of funding will impose unrecoverable financial losses on the organization. RFE/RL is responsible for multiple leases and obligations that it will be forced to default on without Congress's appropriated funds.  For example, RFE/RL has payments due on its leases in Prague, Riga, and Kyiv, to name just a few, that it will not be able to pay next month. USAGM is a co-obligor on some of those leases and obligations, including the one in Prague.

32. Fourth, terminating RFE/RL's operations and laying off its entire staff, even temporarily, will damage RFE/RL's reputation as an employer and reliable partner in these difficult-to-reach countries.  RFE/RL has devoted significant resources and decades of work to building up its staff and language capabilities, as well as its reputation and brand.  For example, RFE/RL launched its Afghan broadcast services in the Dari and Pashto languages first from 1985 to 1993 in response to the Soviet occupation of Afghanistan and then again in January 2002. RFE/RL's broadcasting for Afghanistan depends on journalists based, for security reasons, in Prague who have local expertise, as well as networks of stringers who provide firsthand information as news events unfold.  Reestablishing these networks will be challenging, if not impossible, due to the dangerous circumstances these networks operate in.

33. RFE/RL currently stores the majority of its content on unarchived, external platforms or on leased servers in Prague, Czech Republic.  RFE/RL also owns servers it maintains.  Losing funding means that RFE/RL will no longer be able to maintain these platforms, and these vital records of American history could be lost forever.

34. More broadly, RFE/RL exists to provide independent news coverage that is outside of the control of the governments in the countries in which RFE/RL operates.  Ceasing news coverage, even temporarily, will allow the state-controlled or state-influenced media in these countries to fill the gap with coverage that is favorable to the particular narratives favored by the local governments.  This could have an immeasurable impact in reducing democratic access to information and setting back the work of independent journalism in these countries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2025.

Stephen Capus
President and Chief Executive Officer
RFE/RL, Inc.

6

# Exhibit 1



330 Independence Ave SW, Washington, D.C. 20237

**NOTICE OF GRANT TERMINATION**

March 15, 2025

Dear Radio Free Europe/Radio Liberty (Joseph Lataille | LatailleJ@rferl.org),

This letter provides notice that the U.S. Agency for Global Media (USAGM) is terminating your federal grant, FAIN: 1060-25-GO-00001 and any other grants with USAGM, effective March 15, 2025. *See* 2 C.F.R. § 200.341.

The award no longer effectuates agency priorities. Therefore, pursuant to 2 C.F.R. § 200.340, Article VIII(a) in your grant award, and the President's March 14, 2025 executive order mandating that the USAGM eliminate all non-statutorily required activities and functions, the USAGM hereby terminates grant FAIN: 1060-25-GO-00001 and any other grants with USAGM in its entirety effective March 15, 2025. *See Continuing the Reduction of the Federal Bureaucracy*, E.O. (March 14, 2025).

If you wish to object to or challenge this termination decision, you must do so either via email or certified mail within 30 days of the date of this termination notice. Your appeal should contain the following:

1. a copy of the written notice of termination;
2. the date you received the written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of disallowed costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342. Appeals should be addressed to the undersigned.

You are encouraged to carefully review and discharge your closeout responsibilities as set forth in 2 C.F.R. § 200.344-46, your award instrument, and the USAGM's Terms and Conditions of the Award Agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the USAGM filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking other appropriate enforcement actions, which could impact your eligibility for future grants. *See id.* § 200.344(i). Finally, you are reminded of your duties regarding retention of grant records for at least three years after the submission of your final financial report. *See* 2 C.F.R. § 200.334.

Thank you,

*Kari Lake*

Kari Lake
Senior Advisor to the Acting CEO with Authorities Delegated by Acting CEO

**Add.009**

klake@usagm.gov
330 Independence Ave SW, Washington, D.C. 20237

# Exhibit B

**Declaration of James Landis**

I, James Landis, declare as follows:

1. I am the Head of Corporate Security of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as Head of Corporate Security.

2. If RFE/RL is denied access to its appropriated funds, RFE/RL and its journalists will face threats to their personal and physical security, as well as threats to their cyber security and the personal identifying information contained in RFE/RL's systems. Journalists will also face potential deportation to dangerous countries where they could be persecuted for their reporting for RFE/RL.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Journalists' Personal Security**

3. RFE/RL relies on freelance journalists in other countries to do some of its most critical reporting. Many of these journalists are from countries where RFE/RL personnel are considered foreign agents and in many cases they have faced threats to their physical safety associated with reporting from or about those countries. For many of the freelancers who have managed to leave their native country and continue to work for RFE/RL from the relative safety of a third country, their family members continue to face intimidation, harassment and persecution from state intelligence services and the police. Family members of RFE/RL freelancers in Iran, Russia, Afghanistan, and Belarus have reported threats of arrest and the seizure of property and assets in an effort to compel RFE/RL freelance staff and employees to return.

4. RFE/RL has already begun to terminate contracts with freelance journalists due to RFE/RL's dire cash flow situation. RFE/RL will likely terminate the remainder of their freelance journalists in April 2025 if RFE/RL does not receive its funding soon. For these freelance journalists, the effects of termination include not only their salaries, but also the security provided by RFE/RL to ensure their safety.

5. Without the ability to draw on its congressionally appropriated funds, RFE/RL will no longer be able to protect its journalists from the threats they routinely face. Withholding RFE/RL funds poses considerable risk to journalists operating in authoritarian countries, as the sudden interruption in funding will halt the security services that RFE/RL provides to its journalists. This support comes in various forms, including training and risk assessments for individual journalists. These security services are necessary for RFE/RL journalists to do their work in countries where reporting involves great personal and physical risk.

6. RFE/RL journalists have been the object of specific and credible threats from foreign governments and organized criminal elements associated with foreign governments. These

threats have extended beyond the borders of the country where the threats originated and have been conveyed to RFE/RL security staff from U.S. and allied security services who considered the threats credible and significant enough to warrant briefing the affected personnel and, in some cases, providing additional security to these same employees.

7. For example, RFE/RL worked closely with Ukrainian security services on specific threats targeting RFE/RL journalists in Ukraine. These threats were conveyed in online forums, identified specific RFE/RL journalists by name, and included detailed and personal biographic information, including residential information. Ukrainian police relocated our staff, provided police security and armed escorts, and worked to identify the individuals involved who, on at least one occasion, carried out an act of arson at a previous residence of one of our journalists. Without RFE/RL playing this important role in the security of its employees and journalists, their lives and their work as journalists would be at increased risk.

8. RFE/RL also provides essential security training known as Hostile Environment and First Aid Training ("HEFAT") to staff who operate in hostile environments. This training is augmented in some countries, such as Ukraine, with additional, more intensive first-aid training tailored to the unique threats faced in covering a war.

9. Due to RFE/RL's shortage of funds, RFE/RL has suspended planned HEFAT training courses and will be unable to schedule future training if RFE/RL cannot access its funds.

10. In addition to training, RFE/RL provides personal protective equipment ("PPE")—ballistic vests, helmets, goggles and gas masks—to staff in countries where journalists face risks covering demonstrations, which are not uncommon in many of the countries where we operate. Withholding funding will significantly impair our ability to procure new PPE, thus putting some of our journalists in physical jeopardy.

11. RFE/RL Corporate Security has worked with U.S. and allied security services in managing credible threats targeting journalists in our Russian and Persian-language services, as well as journalists from Belarus. For example, Russian journalists in exile across Europe have been tracked by Russian intelligence operations. They face harassment, abduction, and threats of assassination.

12. When RFE/RL corporate security services have identified credible threats to journalists and staff, RFE/RL collaborates with the relevant local law enforcement to provide security support. Local law enforcement have, for example, provided 24-hour police protection to journalists and staff when needed. RFE/RL Corporate Security personnel are a vital component to this support and provide needed liaison with the relevant police authorities.

13. When there is an identified threat to staff within RFE/RL's operating region, Corporate Security personnel often collaborate with the relevant U.S. Embassy to mitigate the identified threats. In the past two years, Corporate Security has collaborated with U.S. Embassy personnel in Moscow, Riga, Tbilisi, Kyiv and Vilnius on a variety of threats.

2

14. These threats to our staff have included the unlawful detention and imprisonment of Alsu Kurmasheva in Russia and Andrey Kuznechyk in Belarus, ongoing harassment and counter-intelligence concerns to staff in Latvia and Lithuania, and the physical assault of our journalists in Georgia, Romania, Kyrgyzstan, and Tajikistan in connection with their work for RFE/RL. In other countries where we operate, our journalists are frequently called in for questioning by local security services and threatened with arrest and/or legal action for their reporting.

15. Continuing to withhold RFE/RL's resources would eliminate RFE/RL's ability to retain security personnel who are qualified to provide security support to staff receiving threats, liaise with host-nation security personnel, and collaborate with the U.S government to ensure that RFE/RL's journalists are protected.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Physical Security**

16. Without its congressionally appropriated funding, RFE/RL will be forced to reduce or cancel its contracts with guards and other essential security services that safeguard RFE/RL facilities and staff in a number of countries where staff have been targeted.

17. RFE/RL staff and journalists abroad have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting. RFE/RL will no longer be able to provide physically secure office locations and facilities for staff if it is forced to cancel its contracts with security services.

18. RFE/RL currently has guard contracts for our facilities in Prague, Yerevan, and Riga. These guards are essential for providing perimeter security, identifying and responding to threats, and screening staff and visitors. In Prague, where our reporting headquarters has robust physical security features, guard services are required to operate the cameras, barriers, ballistic doors, and screening access points.

**USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding Will Cause Journalists to be Deported to Dangerous Countries**

19. RFE/RL's workforce comprises hundreds of journalists who fled from authoritarian regimes in countries such as Russia and Iran.

20. In many countries where these journalists operate, their residency is based on employment contracts with RFE/RL.

21. If RFE/RL is not funded, it will be forced to lay off the remainder of its employees in April 2025.

22. RFE/RL journalists whose residency relies on their employment may be forced to return to their home countries. In many cases, these journalists will face the threat of torture and imprisonment because of their work for RFE/RL.

3

23. RFE/RL employs over three hundred exiled Russian journalists, who operate from Prague, Riga, and Vilnius. The Russian government has labeled dozens of these journalists as "foreign agents," a designation which imposes fines and can carry criminal punishment of up to five years' imprisonment. They cannot return to Russia due to the real threat of repression and arrest.

24. Alsu Kurmasheva, a dual U.S.-Russian citizen RFE/RL journalist, exemplifies this peril. Russian authorities arrested her in October 2023 during a trip she took to the country, convicted her in July 2024 on fabricated charges of spreading "false information" about Russia's war in Ukraine, and sentenced her to six-and-a-half years in prison. Designated "wrongfully detained" by the U.S. State Department, Ms. Kurmasheva was released via a prisoner swap in August 2024. RFE/RL's Russian staff lacking U.S. citizenship face bleaker prospects—prolonged detention or harsher fates—without RFE/RL's operational shield.

25. Termination of RFE/RL's funding will trigger visa expirations for these journalists, leaving them without legal status within months. For example, among Prague-based employees, Russian, Belarusian, Iranian, Afghan, and other foreign citizens who do not enjoy the visa-free regime that U.S. citizens enjoy can remain in the Czech Republic only for an additional sixty days after the formal termination of their employment. U.S. nationals, who benefit from a visa-free regime, can remain as a tourist for ninety days following termination of their employment, but during those ninety days they are not allowed to work.

26. Journalists without legal status could be deported back to their home countries where they will be exposed to criminal prosecution for their work as journalists as described above.

27. Belarusian staff working in Lithuania also risk being deported to Belarus if they are expelled from Lithuania, where they will be exposed to criminal prosecution. For example, RFE/RL journalist Ihar Losik was detained on June 25, 2020, in advance of Belarus' election in August 2020, and tried on charges including "organization of mass riots" and "incitement to hatred" for his journalistic work. He was convicted on December 14, 2021, and sentenced to fifteen years in prison. Losik currently is enduring harsh conditions in a penal labor colony.

28. Iranian staff without a firm employment contract from RFE/RL face the legal possibility of being returned to a country that considers them traitors and that has a track record of imprisoning, torturing and even executing journalists. In October of 2024, Reza Valizadeh, a dual Iranian-U.S. national and former RFE/RL employee, was arrested when he returned to Iran. He is currently facing charges stemming from his work with RFE/RL.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Cyber Security**

29. RFE/RL is constantly targeted by cyber-attacks. RFE/RL employs a variety of Microsoft and other security tools to protect against cyber-attacks.

30. Without its congressionally appropriated funding, RFE/RL will be forced to shutter its cyber defenses. Some of its critical cybersecurity defense tools have monthly licenses that will lapse in thirty days if there is a delay in payment.

31. Shutting down RFE/RL cyber defenses virtually guarantees that cyber attackers will gain access to sensitive RFE/RL systems and the personal data of over 1,000 people in over twenty countries, including in dictatorships where RFE/RL freelancers risk their lives to send RFE/RL their reports. Allowing cyber criminals and regimes interested in eliminating free press to access that information endangers the lives of those journalists.

32. A common targeted attack, such as a distributed denial-of-service attack, can make our servers inaccessible by overwhelming them with traffic, making RFE/RL's servers unavailable to legitimate users. A more sophisticated attack can also disrupt our web services and alter the content of our websites, making fake news appear credible.

## Long-Term Impacts of the Funding Freeze on RFE/RL's Operations

33. If RFE/RL is forced to close its doors and cease its activities, including essential security services, journalists will be left unprotected and, in many cases, face deportation to dangerous countries. This will destroy the trust, credibility, and relationships RFE/RL has built over decades with its journalists, who rely on RFE/RL to provide for their continued safety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 19, 2025.

James Landis
Head of Corporate Security
RFE/RL, Inc.

5

# Exhibit A

### Supplemental Declaration of Stephen Capus

I, Stephen Capus, declare as follows:

1. I am the President and Chief Executive Officer of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL").  The statements made in this supplemental declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO.

2. Since I submitted my first declaration, our wind-down plan and the adverse effects our services are experiencing as a result of USAGM's termination of our funding have come into sharper focus.

### Financial and Programmatic Steps RFE/RL Is Taking in Response to the Termination of Funding

3. As mentioned in my initial Declaration, due to the lack of funding from USAGM, RFE/RL has had to begin the process of winding down its operations.  We already have cancelled contracts with freelance journalists working for our Russian Service, Radio Farda (our Persian-language service), and Current Time (our 24/7 Russian-language TV network).  The loss of these journalists is impairing our operations.  RFE/RL's journalism must be timely to effectively serve its audience.  News events that RFE/RL cannot cover today because of lack of funding will no longer be breaking news, and will have diminished relevance for our audience.

4. For Radio Farda, the terminations of freelance contracts have resulted in fewer stories being covered by the service.  For example, there was a protest against the clerical establishment by Iranians in Paris that Radio Farda could not cover because we could no longer pay our freelance journalist in Paris.  We also are doing fewer stories on tensions between Iran and Israel and the conflict between Israel and Hamas because we ended the freelance contracts of our reporter in Israel as well as our stringer who helped us secure several exclusive interviews with former Israeli and Mossad officials.  For audience members in Iran, Radio Farda is often the only source of Persian-language news that fairly covers the Israeli perspective in an Iranian media environment otherwise awash in anti-Israel propaganda.

5. In Russia, our programming also has suffered.  Our regional reporting in Russia is heavily dependent on freelance journalists on the ground.  Some of them are still in the country and work anonymously, using security protocols.  We have had to lay off some of these freelancers and we are not providing the same level of news coverage as before.  We also have stopped a weekly video talk show hosted by one of the most outspoken Russian public intellectuals, Sergey Medvedev.  And our Russian Service is no longer able to support distribution across various Internet platforms on the same level as before USAGM terminated funding.

6. Unfortunately, we have now determined that we will have to terminate approximately 90 percent of our freelance contracts on April 1, 2025.  We will meet payroll for our employees through March 30.  We will begin furloughs of our employees on April 1.  Terminating our freelance contracts and furloughing our employees will significantly impede our ability to deliver uncensored news in the 23 countries we serve.

Add.018

7.  As mentioned in my first declaration, as a result of USAGM's funding termination, we are closing our office in Almaty, Kazakhstan. RFE/RL also has lease payments due for our Riga office on March 31, our Prague office on April 1, and our Kyiv office on April 10. We have decided that if we do not receive additional funds, we will miss these lease payments and apply the funds to essential services such as building security and reduced salaries for certain employees.

8.  Obtaining the approximately $7.5 million in funds RFE/RL is due for the March 1-14 period will delay some of these harms for a limited period of time – approximately two weeks.

**Impact of our Wind-Down on RFE/RL Journalists**

9.  As mentioned in my first declaration, layoffs due to RFE/RL's lack of funding from USAGM pose grave security risks for our journalists. Many of our journalists from Russia, Belarus, Iran, and elsewhere face threats of arrest if they return to their home countries because they no longer have work visas through RFE/RL to lawfully stay in their current country of residence.

10. One example is Kanstantsin Lashkevich, Director of RFE/RL's Belarus Service. Mr. Lashkevich joined RFE/RL's Belarus Service in 2017. Under his leadership, RFE/RL's Belarus Service saw record audience engagement. During the 2020 presidential election, which triggered months of protests, one in four Belarusian households followed RFE/RL's live reporting. Ultimately, there was an escalating crackdown by the government and 16 RFE/RL journalists were arrested, detained, and in some cases tortured. Three received lengthy prison sentences (the Trump Administration secured the release of one of these three RFE/RL journalists in February 2025). Following these arrests, in July 2021, RFE/RL relocated Mr. Lashkevich to our journalistic headquarters in Prague, Czech Republic. After Mr. Lashkevich left Belarus, in December 2021 the Belarusian authorities labeled RFE/RL an "extremist organization." Under the laws of Belarus, involvement in such an organization is punishable by up to seven years' imprisonment.

11. In December 2023, the Belarusian government launched a criminal case against Mr. Lashkevich. Mr. Lashkevich remains in the Czech Republic on a residence permit tied to his employment at RFE/RL. Should he lose his job with RFE/RL and have to return to Belarus, he would almost certainly be arrested immediately.

12. In a similar situation are eight of RFE/RL's Russian journalists who currently legally reside in Tbilisi or Riga as a result of their RFE/RL employment. Katerina Klepikovskaya, Elizaveta Maetnaya, Maxim Matveychenkov, Svetlana Prokopyeva, Mikhail Sokolov, Mumin Shakirov, Tatiena Voltskaya, and Mairbek Vachagayev are all on the Kremlin's "foreign agent" list and would face arrest if they have to return to Russia after their employment with RFE/RL terminates.

13. Another example is the case of Vusala Alibayova, the Managing Editor of RFE/RL's Azerbaijani Service. Ms. Alibayova used to work in RFE/RL's Baku Bureau. In 2014, while Ms. Alibayova was serving as Multimedia Editor of the Baku Bureau, Azerbaijani authorities raided and sealed our office and arrested and interrogated our employees. Ms. Alibayova relocated to RFE/RL's journalistic headquarters in Prague. In recent years, Ms. Alibayova has

seen the arrest of her journalist colleagues who remain in Baku and, following this year's presidential election in Azerbaijan, the government included Ms. Alibayova as a suspect in a criminal case launched against local media outlets. Ms. Alibayova's legal residency in Prague is tied to her employment at RFE/RL. Should she lose her job with RFE/RL and have to return to Azerbaijan, she would be subject to arrest.

14. There are numerous other examples of RFE/RL journalists who have dedicated their lives to a free press and unbiased reporting, and who would face significant risks to their personal security and safety and those of their families should they lose their RFE/RL-sponsored work visas and have to return to their home countries.

15. The challenges these RFE/RL journalists face explains why terminating our employees means we lose access to important markets where we serve as an independent source of news outside of government control. It is impossible to create a Belarus Service, a Current Time, or an Azerbaijani Service overnight. These news services are developed over years by dedicated journalists who have long-term relationships with RFE/RL.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 23, 2025.

Stephen Capus
President and Chief Executive Officer
RFE/RL, Inc.

3

**Add.020**

# Exhibit A

**From:** Amy Batchelor <ABatchelor@usagm.gov>
**Sent:** Wednesday, April 9, 2025 9:42 AM
**To:** Stephen Capus <CapusS@rferl.org>; Joseph Lataille <LatailleJ@rferl.org>; Karen Johnsen
<JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Cc:** Royce Min <RMin@usagm.gov>; Roman Napoli <RNapoli@usagm.gov>; Matthew Pollack
<MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>
**Subject:** RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Good morning,:

Please find the **RFE/RL FY-25 Master Grant Agreement** between the USAGM
and RFE/RL attached, made available pursuant to the Full-Year Continuing
Appropriations and Extensions Act, 2025, Division A of P.L. 119-4 (March 13, 2025).

At this time, USAGM intends to approve the submitted 'must pay' financial plan for
**April 1-30, 2025,** in the amount of **$12,178,590.**

The Financial Assistance Identification Number (**FAIN**)for this Grant Award is **1060-
25-GO-00001**.

Please provide a signed version of this Grant Agreement and your entity's **April 2025**
funding request **in order to expedite the payment process**.

We will provide a copy of the bilaterally signed version of this agreement and the
approved financial plan once all necessary signatures have been obtained.

Thank you,

Amy

**Amy Batchelor**
Budget Director
ABatchelor@USAGM.gov
202-920-2456



This electronic message transmission contains information which may be internal or
restricted. The information is intended to be for the use of the individual or entity named
above. If you are not the intended recipient, be aware that any disclosure, copying,
distribution or use of the contents of this information is prohibited. If you have received this
electronic transmission in error, please notify the sender by telephone or by electronic
reply and delete this message.

# Exhibit 1

**Declaration of Joseph Lataille**

I, Joseph Lataille, declare as follows:

1. I am the Chief Financial Officer of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as Chief Financial Officer.

**Overview of the Grant Agreement Process**

2. Typically, each year, USAGM prepares a draft grant agreement and sends it to RFE/RL for review. RFE/RL reviews the draft agreement, corrects any typographical errors, and occasionally proposes minor substantive changes. Simultaneously, USAGM requests, and RFE/RL provides, an annual financial plan with monthly funding requirements. RFE/RL and USAGM usually take a few weeks to exchange edits to the grant agreement. Once there is a final version that both signatories are prepared to sign, the President and CEO of RFE/RL will typically sign the grant agreement on behalf of RFE/RL, and USAGM's CEO will sign the grant agreement on behalf of USAGM. The grant agreement is then fully executed for the year. The annual financial plan with monthly funding requirements is included as an addendum to the grant agreement.

3. **The FY 2024 Master Grant Agreement.** On November 8, 2023, USAGM's CEO signed the FY 2024 Grant Agreement (FAIN: 1060-24-GO-00001). The FY 2024 Grant Agreement contains the full set of terms and conditions that have governed USAGM's disbursements of RFE/RL's congressionally appropriated funding since the FY 2024 Grant Agreement was concluded. *See* Exhibit A.

4. **The October 15, 2024 Grant Agreement for Additional Amounts in FY 2025**. On October 15, 2024, USAGM signed a "Grant Agreement Between [USAGM] and RFE/RL, Inc. For Additional Amounts in FY 2025" (FAIN: 1060-25-GO-00001). This agreement obligated funds to RFE/RL under the Continuing Appropriations and Extensions Act of 2025 under the terms and conditions of the FY 2024 Grant Agreement.

5. **The December 31, 2024 Grant Agreement for Additional Amounts in FY 2025.** On December 31, 2024, USAGM signed an amendment to the "Grant Agreement Between [USAGM] and RFE/RL, Inc. For Additional Amounts in FY 2025" (FAIN: 1060-25-GO-00001). This agreement obligated funds to RFE/RL under the American Relief Act of 2025 under the terms and conditions of the FY 2024 Grant Agreement.

6. **The February 2025 Negotiations Over the FY 2025 Master Grant Agreement.** On February 14, 2025, USAGM initiated its usual process for executing the grant agreement with RFE/RL by sharing a draft of the FY 2025 grant agreement. From February 14 to February 27, USAGM and RFE/RL exchanged minor edits over email and over the phone to the grant agreement. On February 27, the USAGM Budget Director said that she would send "a signable file ASAP" and indicated RFE/RL would sign first. USAGM followed up with the finalized FY 2025 grant agreement and requested a "*signed*" version of this Master Grant Agreement at

your earliest convenience." That same day, RFE/RL signed the agreement and sent it back to USAGM for USAGM's signature. On February 28, USAGM confirmed that they had received the signed agreement. RFE/RL also asked whether there were "[a]ny issues with countersigning the grant agreement." USAGM's CFO responded "nope." The FY 2025 Grant Agreement, signed by RFE/RL but not countersigned by USAGM, is attached as Exhibit B.

7. USAGM, never returned the countersigned agreement to RFE/RL. RFE/RL contacted USAGM multiple times to request the countersigned agreement. USAGM's only response was that the countersigned agreement "had not come back from the front office." In the normal course, USAGM would have responded promptly and sent the countersigned agreement.

8. Despite RFE/RL's requests, and contrary to the standard practice of the parties, USAGM has not returned a countersigned agreement to RFE/RL.

**The March 27, 2025 Grant Agreement for Additional Amounts in FY 2025 Sent to RFE/RL After This Litigation Commenced**

9. On March 27, 2025, RFE/RL sent a funding request to USAGM requesting the remaining congressionally appropriated funds for March 15–31, as well as for April, 2025. On April 3, 2025, USAGM responded by sending an amendment to the "Grant Agreement Between [USAGM] and RFE/RL, Inc. For Additional Amounts in FY 2025" (FAIN: 1060-25-GO-0001). This grant agreement, which covered funding for March 15–31 and also documented USAGM's payment of the March 1-14 funding incorporated the terms and conditions of the FY 2024 Grant Agreement and obligated RFE/RL's congressionally appropriated funds, like the grant agreements from October 15, 2024 and December 31, 2024.

10. As is customary, I responded to the email and asked for clarification on some questions from USAGM. USAGM responded within a few minutes with availability to discuss my questions. In the normal course, USAGM responds promptly to my requests for information.

11. After briefly discussing with USAGM, RFE/RL promptly signed and returned the grant agreement to USAGM. USAGM never returned the countersigned grant agreement. *See* Exhibit C.

12. RFE/RL received its appropriated funds for March 15–31, 2025 on April 8, 2025.

**The "RFE/RL FY-25 Master Grant Agreement"**

13. On April 9, 2025, RFE/RL received an email attaching the "RFE/RL FY-25 Master Grant Agreement." This "Master Grant Agreement" contained numerous new terms and conditions that RFE/RL had never seen before in any grant agreement with USAGM and that were not part of the agreed February 2025 version of the FY 2025 Master Grant Agreement. I responded to USAGM, asking whether there was availability to discuss this new agreement. *See* Exhibit D. USAGM has not responded to my email. It is unusual for no one from USAGM to respond to a request to discuss a grant agreement.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 12, 2025.

_____
Joseph Lataille
Chief Financial Officer
RFE/RL, Inc.

3

# Exhibit A

**Fourth Declaration of Stephen Capus**

I, Stephen Capus, declare as follows:

1. I am the President and Chief Executive Officer of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as President and CEO.

**RFE/RL's Grant Agreement and Relationship with USAGM**

2. RFE/RL and USAGM have entered into a Master Grant Agreement, typically on an annual basis, for many years. The current form of the grant agreement dates back to 2011. As described in my previous declarations, RFE/RL and USAGM will generally discuss and implement minor changes to the annual grant agreement. For example, the FY2025 Master Grant Agreement signed by RFE/RL in February 2025 changed the frequency of certain required reports from "monthly" to "quarterly" in Article VII.

3. The Master Grant Agreement will typically include as an attachment RFE/RL's Approved Financial Plan. This is a one-page document that summarizes RFE/RL's monthly spending. An example is attached as Exhibit 1.

4. The FY2025 Master Grant Agreement sent by USAGM to RFE/RL on April 9, 2025 (the "Grant Agreement"), contained new terms and conditions that USAGM did not discuss with RFE/RL in advance. Most of these new terms are unworkable for RFE/RL in multiple ways.

5. RFE/RL is a large nonprofit organization with complex operations in 23 countries and in 27 languages. Though the precise number of employees is in flux due to RFE/RL's funding shortage, RFE/RL still has over 1,300 current employees, some of whom operate in difficult-to-reach and unstable areas.

6. The Grant Agreement requires that "[a]ll members of the Board of Directors . . . be approved by the USAGM CEO." Art. V(a). The USAGM CEO does not currently approve or remove RFE/RL's Board of Directors. The Board of Directors manages RFE/RL's business and affairs, including the election or removal of Board members, the appointment or removal of RFE/RL's officers, the approval of RFE/RL's audits, and the alignment of RFE/RL's strategy with its mission. This condition would fundamentally alter RFE/RL's relationship with USAGM and permit USAGM to exercise complete control over RFE/RL.

7. The Grant Agreement requires that RFE/RL compile a "complete accounting of all . . . communications and meetings – whether formal or informal" with "House and Senate staff and Members and any other entity within the Executive Branch." Art. V(b)(2). From a practical standpoint, RFE/RL cannot prepare a retrospective "complete accounting" of all such past communications. RFE/RL has not historically tracked this information, and RFE/RL regularly contacts persons associated with the U.S. government as part of its operations as a news organization. As just one example, in 2024 RFE/RL had many such communications and

1

meetings every single week just on the subject of Alsu Kurmasheva, our reporter who was incarcerated in Russia.

8. The Grant Agreement requires RFE/RL to, upon USAGM's request, "delete language services within [14 days] of such notice." Art. III(b). A "language service" is RFE/RL's broadcasting and news operations in a specific language. RFE/RL has 26 language services. Each of RFE/RL's language service operations operates as a mini-news network, with journalists, technical and administrative support, and freelancers working in that language. Halting broadcasting and winding down operations for a single language service cannot be done in 14 days. This would require contacting all employees and contractors for that language service, terminating those employees, many of whom are subject to employment laws in foreign countries, and terminating contracts that may incur penalties or lead to litigation against RFE/RL for breach of contract. For example, RFE/RL's Ukrainian Service is an extremely complex enterprise—over 150 employees work in three different offices (Prague, Kyiv, and Lviv), and some of its reporters operate from the front lines. As is the case in most of the countries in which RFE/RL operates, RFE/RL's Ukrainian Service employees are entitled to a notice period when their employment is terminated. RFE/RL cannot possibly shut down such a complex operation in two months, let alone two weeks.

9. The Grant Agreement requires that "[a]ny and all contracts and leases entered into by [RFE/RL] must be secured by [RFE/RL] solely without any guaranty, co-signing, or obligation incurred by USAGM." Art. I(c). USAGM is currently the guarantor on RFE/RL's main lease in Prague, Czech Republic, as required by the landlord. If USAGM insists that future leases must be secured solely by RFE/RL, as a practical matter, under this condition, RFE/RL is likely to lose access to the physical location currently housing its Prague headquarters. RFE/RL cannot perform its operations without its Prague headquarters.

10. Additionally, the Grant Agreement provides that "[a]ny default or late payment made on any real property or real estate occupied by [RFE/RL] shall be deemed a material breach of this grant agreement." Art. I(c). Because USAGM withheld RFE/RL's congressionally appropriated funds for April 2025, RFE/RL has already missed a lease payment in Brussels and was late paying rent in Prague. Therefore, upon signing the Grant Agreement, RFE/RL may automatically be in breach because of USAGM's prior actions.

11. The Grant Agreement requires RFE/RL to agree that "USAGM may at any time hire an independent audit of all Recipient books, financials, security protocols and/or operations." Art. II(c). RFE/RL already undergoes annual audits by an accredited, independent auditor. These financial audits are available to USAGM through the Federal Audit Clearinghouse or upon request. RFE/RL is also subject to audits by the Government Accountability Office. RFE/RL devotes over 800 hours of time from 25 staff members across Office Services, Procurement and Finance to conducting the annual financial statement audit and USAGM site reviews. Subjecting RFE/RL, an independent organization, to additional audits by auditors chosen by USAGM without any parameters set on their qualifications or their overlap with RFE/RL's existing, accredited auditors may be costly and duplicative. In addition to its independent audit, RFE/RL conducts the following reporting:

Add.029

a. Over the past two fiscal years, RFE/RL has submitted more than 1,200 reports to USAGM, the State Department Office of Inspector General, Congress, and other federal entities. For example, as mandated by Congress, RFE/RL conducts a program review of each of its 26 language services at least once each fiscal year. These program reviews are conducted in accordance with Congressional mandates and USAGM guidelines. At the end of each program review cycle, RFE/RL submits the materials from each program review to USAGM. After reviewing the materials, the USAGM CEO and performance management team meet with RFE/RL management and program review leadership to discuss the USAGM oversight report that is prepared after reviewing the RFE/RL program review materials from the previous fiscal year.

b. RFE/RL prepares and submits regular financial, contracting, and staffing reports to USAGM. This includes the Form 425, which is a monthly Federal Financial Report, and a Statement of Obligations and Disbursements, which describes RFE/RL's contracts and grants. RFE/RL also produces an annual Inventory Report, which lists all the movable property that RFE/RL owns.

12. The Grant Agreement requires that RFE/RL "forgo [its] grant funds in their entirety" if RFE/RL "engage[s] in fundraising from outside sources." Art. IX(a). RFE/RL is a private, independent corporation that Congress has funded for decades without putting this kind of restriction on RFE/RL's ability to raise funds from other sources. In addition to treading on RFE/RL's professional independence by imposing categorical restrictions on RFE/RL's source of funding, this unprecedented provision puts RFE/RL in an impossible situation. As the agency's recent actions indicate, RFE/RL cannot rely on USAGM for the funding that it needs to operate. This provision ensures that RFE/RL also cannot seek other sources of funding without losing all its grant funding.

13. The Grant Agreement requires substantial revisions to RFE/RL's Approved Financial Plan. Instead of the one-page document that is currently used, the Agreement changes the plan to "include a detailed breakdown of where grant funds are being spent with specificity including but not limited to the salary for every employee, contractor, fellow/fellowship and a detailed breakdown of every contract, contractor, grant, sub-grant, vendor, and supplier including the beneficial ownership information of each of those entities for every owner with any ownership share in any entity receiving funds from the Recipient." Art. VII(b)(2). At the beginning of March 2025, RFE/RL had over 1,300 employees and approximately 1,000 freelancers, as well as extensive IT, building maintenance, software, media, and production contracts. Reporting this information would require hundreds of pages of reporting, and keeping this information up-to-date would require additional significant effort because changes to RFE/RL's employees, contracts, and line-item spending happen every day. If USAGM would need to approve any change to this financial plan, RFE/RL would not be able to conduct its day-to-day operations in the normal course.

14. The Grant Agreement requires that RFE/RL provide a "supplemental accountability report" within five days of the agreement's execution that includes an "accounting of all expenditures of funds provided under this Agreement made to any non-profit organization or to any provider of legal services," an "accounting of any and all beneficial owners of any recipient of any expenditure of funds," "[r]esumes" of all personnel, and identification of all beneficial owners

3

who have previously served as an employee or contractor of USAGM, RFE/RL, and any other organization with which USAGM maintains a grant agreement. Art. VII(d)(8). RFE/RL does not collect information regarding the beneficial owners of its fund recipients in the normal course of business. To collect this information would require RFE/RL to correspond across multiple time zones with fund recipients in foreign countries to request the necessary legal documents that may need to be translated to English. In addition to its full-time staff, RFE/RL employs freelance journalists. Many of these employees operate in circumstances where access to communication networks is limited, and I am not certain that we would be able to request and receive their resumes within a week. Compiling all this information in five days is not possible given the breadth and complexity of RFE/RL's operations.

15. The Grant Agreement entitles USAGM to "conduct site visits . . . to each Recipient headquarters site (domestic/overseas) and to a select bureau(s) of the Recipient each fiscal year. USAGM shall be entitled to site visits with 24 hours notice to the Recipient." Art. VII(e). It further requires RFE/RL to "have all books and records available for inspection on site at all times." *Id.* For these site visits, USAGM will not be required to provide RFE/RL with a checklist of items to review and discuss. *Id.* RFE/RL has bureaus or offices in Armenia, Belgium, Bosnia, Bulgaria, the Czech Republic, Georgia, Hungary, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Kosovo, Moldova, Montenegro, North Macedonia, Romania, Serbia, Tajikistan, Ukraine, and the United States. RFE/RL has employees operating in unstable areas, such as the front line in Ukraine. Arranging a site visit at certain locations on 24 hours' notice would be challenging, if not impracticable and unsafe. While USAGM has conducted site visits with RFE/RL in the past, RFE/RL typically had weeks of advance notice to prepare the logistics for such meetings.

16. As a news organization, RFE/RL maintains servers containing archives of its information, in some cases including financial information, in Almaty, Belgrade, Bishkek, Bucharest, Chisinau, Dushanbe, Kyiv, Lviv, Sarajevo, Skopje, Riga, Pristina, Tbilisi, Vilnius, Washington, and Yerevan.

17. Providing access to these systems on 24 hours' notice would be difficult for RFE/RL's security and IT services teams.

18. RFE/RL is not familiar with the "USAGM Insider Threat Program" described in Article X(h) of the Grant Agreement. RFE/RL has not been informed of what the criteria for an insider threat would be and has not received any other information relating to this program.

**Current Impact of USAGM's Refusal to Disburse Congressionally Appropriated Funds**

19. RFE/RL last received a disbursement of $2,860,341 in funds from USAGM on April 8, 2025 for funds covering expenses for March 15–31. In the normal course, RFE/RL receives its monthly funding at the beginning of each month.

20. RFE/RL does not maintain large cash reserves as it relies on the United States government for approximately 99% of its funding. RFE/RL currently has approximately $15 million of cash on hand. If RFE/RL were to maintain normal operations, these funds would run out by the end of May 2025.

21. Since March 15, 2025, RFE/RL has taken steps to conserve its funds and reduce its operating expenses, including by furloughing approximately 122 employees in Prague. RFE/RL is in the process of furloughing an additional 166 employees based in RFE/RL's bureaus. RFE/RL has severed contracts with nearly all of its freelance journalists and cancelled leases for our bureaus in (i) Osh, Kyrgyzstan, (ii) Banja Luka, Bosnia and Herzegovina; and (iii) Almaty, Kazakhstan. RFE/RL continues to accept work from a very small portion of our regular contributors, without whom we would struggle to keep services functioning at all.

22. To conserve resources, RFE/RL has cancelled contracts for fire and safety inspections, security developer tools, grounds upkeep, and cloud services backups. RFE/RL has also reduced contracts for building maintenance and cleaning, as well as cutting software licenses and reducing the number of software features available to our staff. These changes are harming productivity and communication among our teams.

23. These steps to conserve funds are causing immediate harms to RFE/RL's reputation, its broadcasting, and its employees, as described in my previous declarations.

24. RFE/RL has halted certain broadcasting and news operations, including the Morning Show produced by the Ukrainian Service; Votvot, a streaming platform created for Russian-language cultural content that is unavailable inside Russia; "Sisterhood," a program for women, "Azattyk+," a program for young viewers, and the "Experts Discuss" debate program, produced by the Kyrgyz Service; and all podcasts produced by the Moldova Service. The halting of broadcasting operations harms RFE/RL's reputation with both news viewers and its employees.

25. As mentioned above, RFE/RL has already missed its lease payment in Brussels and was late paying rent in Prague. RFE/RL has lease payments due on May 1 on leases in 24 locations. Absent additional funding, RFE/RL will not be able to make these lease payments.

26. Starting on May 1, RFE/RL will begin the process of furloughing 100-200 additional employees while considering how many can be laid off in compliance with local laws.

27. If RFE/RL does not receive additional funding, soon after May 1 RFE/RL will be forced to cancel more contracts. This will include additional software and cybersecurity licenses, Adobe video editing and design software licenses, data center contracts, services for audio streaming, notification systems for RFE/RL's websites, utility services such as water, gas, and electricity, and additional building and maintenance services. Some of these contracts will be subject to early termination penalties.

28. If RFE/RL does not receive any more funding from USAGM, RFE/RL will have no choice but to close down the vast majority of the organization in May 2025. This will include terminating contracts that enable RFE/RL's production of live video news coverage and access to its current and archived media content.

29. If RFE/RL receives April funding but does not receive any additional funding thereafter, RFE/RL will still be forced to wind down its operations, and will have no choice but to close down the vast majority of the organization in June 2025.

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 21, 2025.

Stephen Capus
President and Chief Executive Officer
RFE/RL, Inc.

6

# Exhibit C

### Second Declaration of Joseph Lataille

I, Joseph Lataille, declare as follows:

1. I am the Chief Financial Officer of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as Chief Financial Officer.

### Communications with USAGM Since April 9, 2025

2. On April 9, 2025, I emailed USAGM to clarify the RFE/RL FY-25 Master Grant Agreement, but received no response from USAGM. I followed up again with USAGM via email on April 15. RFE/RL's email communications with USAGM are attached as Exhibit 1. RFE/RL has not received any subsequent communications from USAGM regarding the FY-25 Master Grant Agreement. Specifically, RFE/RL has not received a response to its April 16 email requesting that USAGM respond by noon on April 17, 2025.

3. In its email of April 16 at 12:12 pm, RFE/RL attached a redline of edits to the RFE/RL FY-25 Master Grant Agreement to USAGM via email. The RFE/RL redline is attached as Exhibit 2.

4. In its email of April 16 at 2:54 PM, USAGM attached a redline of edits to the RFE/RL FY-25 Master Grant Agreement to RFE/RL via email. The USAGM redline is attached as Exhibit 3.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2025.

Joseph Lataille
Chief Financial Officer
RFE/RL, Inc.

1

# Exhibit 1

**From:** Karen Johnsen <JohnsenK@rferl.org>
**Sent:** Wednesday, April 16, 2025 8:36 PM
**To:** Roman Napoli <RNapoli@usagm.gov>; Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Roman,

(Joe is traveling this evening so I'm sending this on his behalf.)

Thank you for your note.  Simply changing some of the 24-hour deadlines to 14 days does not address our concerns.

You requested "clarification as to which provision in Art. V(a) RFE/RL asserts is 'illegal.'" As we have previously explained, USAGM lacks authority to require the following condition:

"[A]ll members of the Board of Directors must be approved by the USAGM CEO. All current board members not approved in writing by the USAGM CEO must obtain approval by the USAGM CEO, or their designee, in writing. If this approval is not gained, the appointment to the Board of Directors shall be null and void. For all current and newly proposed Board members who have not received such approval, a resume along with relevant information concerning experience and expertise in the relevant fields of broadcasting must be sent to the USAGM CEO within 24 hours of signing of this grant agreement. Additionally, each proposed board member must attest, in a notarized affidavit, to a lack of conflict of interest and provide financial disclosures similar to those required of US government personnel to the USAGM CEO.  Failure to obtain approval of any or all of the Board of Directors by the USAGM CEO, or their designee, shall be deemed to be a material breach of this grant agreement."

"[A]n agency literally has no power to act . . . unless and until Congress confers powers upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Congress has specifically considered whether to confer on USAGM the power to impose this condition. In 2017, Congress amended the International Broadcasting Act to authorize USAGM to "condition, if appropriate, any grant or cooperative agreement to RFE/RL, Inc. [and certain other grantees] . . . on authority to determine membership of [RFE/RL's] boards." National Defense Authorization Act for Fiscal Year 2017 ("FY2017 NDAA"), Pub. L. 114-328, 130 Stat. 2000, 2550 (2016) (codified at 22 U.S.C. § 6204(20) (2017)).  Congress then repealed that grant of authority.  See National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022) (amending 22 U.S.C. § 6204(a) by "striking paragraph (20)").  Under these circumstances, the agency lacks power under the

International Broadcasting Act to impose this condition, and it is illegal for the agency to act beyond its statutory authorization.

Additionally, the CEO of USAGM is required, in carrying out its functions, to "respect the professional independence and integrity of" RFE/RL. 22 U.S.C. § 6204(d). The condition does not respect RFE/RL's professional independence and integrity. Finally, even if this condition were not illegal, USAGM has identified no need for it to have control over the Board of RFE/RL, a private non-profit corporation, and there is no sound reason for giving USAGM such a power.

Let me also take this opportunity to further explain our objections to the other unprecedented provisions I highlighted in my email of yesterday, and why we disagree with the agency's assertion that these provisions are reasonable:

- Article I(c) – As you know, USAGM is currently the guarantor on our main lease in Prague. This was a requirement of our landlord. Therefore, if you insist that future leases must be secured solely by RFE/RL, as a practical matter this may prevent us from having a physical space in which to operate in the future. Without that physical headquarters, we cannot perform our operations.

- Article III(b) – "Deleting" entire services within 14 days remains entirely impractical. For example, RFE/RL's Ukrainian Service is an extremely complex enterprise—its employees work in three different offices (Prague, Kyiv, and Lviv); some of its reporters operate from the front lines; and, as is the case in most of the countries in which RFE/RL operates, its employees are entitled to a notice period when their employment is terminated. It would be impossible to "delete" our Ukrainian Service in two months, let alone two weeks. Furthermore, although RFE/RL is open to discussing efficiencies that can be implemented to benefit the American taxpayer, we reject the premise of this provision. RFE/RL produces content in 27 languages, and Voice of America also produces content in some of those languages. Yet RFE/RL's mission, content, and audience are unique and do not involve "duplicative programming" with VOA.

- Article V(b)(2) – As an independent 501(c)(3), we cannot agree to "a complete accounting" of all "communications and meetings – whether formal or informal" with government officials by our directors, employees, officers, contractors, staffers, affiliates and/or board members. This is intrusive and will have a chilling effect on our work. Further, it is also not practical to prepare a "complete accounting" of all such past communications. For example, during the year 2024 RFE/RL had many such communications and meetings just on the subject of Alsu Kurmasheva, our reporter who was incarcerated in Russia, every single week.

- Article XII(c) – We are concerned with the demand for a USAGM audit of RFE/RL, as RFE/RL already undergoes annual audits by an accredited auditor.  These financial audits are already available to USAGM through the Federal Audit Clearinghouse or upon request.  Over the past two fiscal years, RFE/RL has submitted more than 1,200 reports to USAGM, the State Department OIG, Congress, and other federal entities.  RFE/RL is also subject to audits by the Government Accountability Office. As an independent organization, we cannot accept being subjected to additional audits by auditors chosen by USAGM without any parameters set on their qualifications or their overlap with our existing, accredited auditors.

- Article IX(a) – It is unacceptable to put a stranglehold on RFE/RL by threatening to terminate our funding on the one hand, and forbidding us to fundraise from outside sources on the other.  We are a private, independent corporation, and Congress has funded us for decades without putting any such restriction on our ability to raise funds from other sources.

Please let us know if with these further explanations you are able to accept our deletions of the above provisions that we find unacceptable.  As you know, we did not delete every new provision you proposed in the new master grant agreement, and instead proposed revisions to a number of the new provisions. But the provisions we have identified above unlawfully limit our ability to perform our mission and we cannot agree to them.  In addition to these conditions being unreasonable on their own, we view them together as falling short of USAGM's statutory obligation to make a grant "available" to RFE/RL.

We would also appreciate an explanation of what has changed since we reached agreement with you at the end of February on terms and conditions to govern the FY 25 master grant, so as to necessitate these extensive new conditions.

Finally, given that you failed to respond to our request for a mini-agreement that would provide us with April funding by today at 5 pm EDT, we assume you have rejected that request.  Please let us know if we are mistaken.

We would appreciate your response by noon EDT tomorrow, April 17, before the status conference in RFE/RL Inc. v. Kari Lake, et al.

Best regards,


-Karen

**From:** Roman Napoli <RNapoli@usagm.gov>
**Sent:** Wednesday, April 16, 2025 2:54 PM

**To:** Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** Re: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Joe,

Thank you for the redline version of RFE/RL's proposed changes. The agency maintains that its language is reasonable. However, as a sign of its willingness to finalize a new grant agreement and provide RFE/RL with funding expeditiously, the agency is willing to change most of the 24-hour deadlines to 14 days. Please see our attached redline with embedded comments.

The agency also requests clarification as to which provision in Art. V(a) RFE/RL asserts is "illegal" and an explanation as to why RFE/RL believes it violates a specific law.

Thanks,

Roman

---

**From:** Joseph Lataille
**Sent:** Wednesday, April 16, 2025 12:12 PM
**To:** Roman Napoli; Amy Batchelor
**Cc:** Royce Min; Matthew Pollack; Marcus Murchison; Stephen Capus; Karen Johnsen; Wanda Ditrichova
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Roman,

Thank you for your response. We understand from your email below that USAGM has rejected RFE/RL's proposal that USAGM countersign the FY25 Master Grant Agreement that USAGM asked us to sign and that RFE/RL did sign on February 27, 2025.

If we are mistaken in that understanding, please let us know by 5 PM Eastern today.

Per your request below, I am attaching a redline version of the April 9 Master Grant Agreement that shows the edits we request.


We reiterate that RFE/RL urgently needs its congressionally appropriated funds for April, and we ask USAGM to consider our proposal to promptly enter into a one-month extension of the previous grant terms to cover our April expenses while we renegotiate the Master Grant Agreement.


We appreciate your prompt attention to these requests and look forward to a response by 5 PM Eastern today.


Best regards,

Joe




**From:** Roman Napoli <RNapoli@usagm.gov>
**Sent:** Tuesday, April 15, 2025 6:10 PM
**To:** Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** Re: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001


Hello Joe,


On the line edits to the grant agreement provided last week, leadership has asked that a red line version be provided with the specific edits RFE/RL is seeking.

Thanks.

---

**From:** Joseph Lataille <LatailleJ@rferl.org>
**Sent:** Tuesday, April 15, 2025 4:12 PM
**To:** Roman Napoli <RNapoli@usagm.gov>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <ditrichovaw@rferl.org>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Amy and Roman,

I am following up on my April 9, 2025 email below, to which I have received no response.

RFE/RL has reviewed the FY25 "Master Grant Agreement" that you sent and asked us to sign on April 9. I wanted to provide you with our reactions. The Master Grant Agreement contains at least one provision (Article V(a)) related to RFE/RL that is clearly illegal, several conditions that are impossible to meet, and many other provisions that are unreasonable and unprecedented. All of these provisions were imposed on RFE/RL without explanation or justification, and they are a significant departure from the February 27, 2025, FY 2025 Master Grant Agreement that the parties had agreed to execute (and from our past grant agreements as well). Meanwhile, as USAGM is fully aware, RFE/RL is in urgent need of the April funds that Congress appropriated to us and that in the normal course would have been disbursed to us at the end of March, before April 1.

Accordingly, RFE/RL requests the following:

That USAGM, by 5:00 PM on April 16, countersign the Master Grant Agreement that you asked us to sign and that RFE/RL did sign on February 27, 2025—which you confirmed in writing on February 28 was acceptable to both parties, and that USAGM then initiate disbursement of the April funds no later than April 18.

**Add.042**

If USAGM is for some reason unwilling to enter into the Grant Agreement that both parties agreed to on February 27:

- RFE/RL requests that the parties enter into a one-month extension of the previous grant terms, as we did with respect to RFE/RL's March 1-31 funds. We ask that this grant agreement extension be executed by 5:00 PM on April 16, and that USAGM initiate disbursement of the April funds no later than April 18. This short-term extension of the prior agreement to permit disbursement of the April funds is necessary because RFE/RL is currently suffering (and will continue to suffer) significant harms due to its lack of April funding while any negotiations proceed.

- With regard to any new Master Grant Agreement based on the draft sent to us on April 9, RFE/RL requests that USAGM, as a sign of its willingness to negotiate a new grant agreement, agree to delete the following unprecedented provisions:

  - Art. I(c) – "Any and all contracts and leases entered into by the Recipient must be secured by the Recipient solely without any guaranty, co-signing, or obligation incurred by USAGM. All leases and spaces purchased by the Recipient with grant funds must be immediately assignable to USAGM upon 24 hours notice."

  - Art. III(b) – "Insofar as the Recipient has duplicative programming with USAGM's other entities, the Recipient shall immediately reduce and delete language services upon notice by USAGM within 24 hours of such notice. Any refusal to delete language services within 24 hours of such notice shall be deemed a material breach of this agreement and shall result in the grant being terminated."

  - Art. V(a) – "All compensation, travel expenses, and other fringe benefits to the Board of Directors for the past three years must be disclosed in writing within 24 hours of signing of this agreement and on a monthly basis thereafter. All members of the Board of Directors must be U.S. citizens. Additionally, all members of the Board of Directors must be approved by the USAGM CEO. All current board members not approved in writing by the USAGM CEO must obtain approval by the USAGM CEO, or their designee, in writing. If this approval is not gained, the appointment to the Board of Directors shall be null and void. . . . Failure to obtain approval of any or all of the Board of Directors by the USAGM CEO, or their designee, shall be deemed to be a material breach of this grant agreement."

  - Art. V(b)(2) – "Within 24 hours after the execution of this Agreement, the Recipient will provide the USAGM CEO a complete accounting of all such communications and meetings – whether formal or informal – with the above-described entities, including but not limited to their directors, employees, officers, contractors, staffers, affiliates and/or board members made or held within the last 365 days."

- o Art. VIII(c) – "Recipient acknowledges and agrees that USAGM may at any time hire an independent audit of all Recipient books, financials, security protocols and/or operations. Recipient is required to provide all requested information and access to USAGM and/or its designated auditors/inspectors to all books, records, facilities, and technical systems within 24 hours notice in whatever manner, electronic or otherwise, deemed appropriate by USAGM. Failure to provide such access and/or information as described above shall be deemed to be a material breach of this grant agreement."

- o Art. IX(a) – the provision specifying that RFE/RL "may not engage in fundraising from outside sources"—or if we do, we "must forgo [our] grant funds in their entirety."

- RFE/RL asks that USAGM agree to deletion of these provisions by 5:00 PM Eastern on April 16. To be clear, RFE/RL will have further requested revisions to the grant agreement that it intends to propose regarding other problematic conditions newly added to the grant agreement without explanation, but RFE/RL believes that an agreement by USAGM to delete these provisions—which are unlawful, unreasonable, and/or unworkable—is the minimum necessary to demonstrate that USAGM is actually willing to negotiate in good faith.

Given our dire situation and the unfortunate need to continue to wind down the organization (since it is April 15 and USAGM continues withholding RFE/RL's congressionally appropriated funds), please substantively respond to this email within 24 hours with specific answers to our requests. Because we have not received our April funding, RFE/RL has had to terminate nearly all its freelance agreements, has furloughed 122 Prague employees, and is currently in the process of furloughing an additional 166 employees based in RFE/RL's bureaus. If RFE/RL does not receive its April funding soon, we will be forced to furlough an additional 150-200 employees later this month and to implement a new round of furloughs effective May 1.

We look forward to receiving your response by 5:00 PM tomorrow.

Best regards,

Joe

**From:** Joseph Lataille
**Sent:** Wednesday, April 9, 2025 9:51 AM
**To:** Amy Batchelor <ABatchelor@usagm.gov>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Are you able to quickly talk to clarify?

**From:** Amy Batchelor <ABatchelor@usagm.gov>
**Sent:** Wednesday, April 9, 2025 9:42 AM
**To:** Stephen Capus <CapusS@rferl.org>; Joseph Lataille <LatailleJ@rferl.org>; Karen Johnsen
<JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Cc:** Royce Min <RMin@usagm.gov>; Roman Napoli <RNapoli@usagm.gov>; Matthew Pollack
<MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>
**Subject:** RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Good morning,:

Please find the **RFE/RL FY-25 Master Grant Agreement** between the USAGM
and RFE/RL attached, made available pursuant to the Full-Year Continuing
Appropriations and Extensions Act, 2025, Division A of P.L. 119-4 (March 13, 2025).

At this time, USAGM intends to approve the submitted 'must pay' financial plan for
**April 1-30, 2025,** in the amount of **$12,178,590.**

The Financial Assistance Identification Number (**FAIN**) for this Grant Award is **1060-25-GO-00001**.

Please provide a signed version of this Grant Agreement and your entity's **April 2025** funding request **in order to expedite the payment process**.

We will provide a copy of the bilaterally signed version of this agreement and the approved financial plan once all necessary signatures have been obtained.

Thank you,

Amy

**Amy Batchelor**
Budget Director
ABatchelor@USAGM.gov
202-920-2456



This electronic message transmission contains information which may be internal or restricted. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify the sender by telephone or by electronic reply and delete this message.

# Exhibit 1

**From:** Roman Napoli <RNapoli@usagm.gov>
**Sent:** Thursday, April 24, 2025 11:40 AM
**To:** Karen Johnsen <JohnsenK@rferl.org>; Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** Re: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Karen and Joe,

Please see a clean, editable version of the grant agreement that we would like your redline edits added to. We will use this version going forward. Please provide those as soon as possible.

Thanks.

---

**From:** Karen Johnsen <JohnsenK@rferl.org>
**Sent:** Wednesday, April 16, 2025 8:35 PM
**To:** Roman Napoli <RNapoli@usagm.gov>; Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Wanda Ditrichova <ditrichovaw@rferl.org>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Roman,

(Joe is traveling this evening so I'm sending this on his behalf.)

Thank you for your note.  Simply changing some of the 24-hour deadlines to 14 days does not address our concerns.

You requested "clarification as to which provision in Art. V(a) RFE/RL asserts is 'illegal.'"  As we have previously explained, USAGM lacks authority to require the following condition:

"[A]ll members of the Board of Directors must be approved by the USAGM CEO. All current board members not approved in writing by the USAGM CEO must obtain approval by the USAGM CEO, or their designee, in writing. If this approval is not gained, the appointment to the Board of Directors shall be null and void. For all current and newly proposed Board members who have not received such approval, a resume along with relevant information concerning experience and expertise in the relevant fields of broadcasting must be sent to the USAGM CEO within 24 hours of signing of this grant agreement. Additionally, each proposed board member must attest, in a notarized affidavit, to a lack of conflict of interest and provide financial disclosures similar to those required of US government personnel to the USAGM CEO.  Failure to obtain approval of any or all of the Board of Directors by the USAGM CEO, or their designee, shall be deemed to be a material breach of this grant agreement."

1

**Add.048**

"[A]n agency literally has no power to act . . . unless and until Congress confers powers upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Congress has specifically considered whether to confer on USAGM the power to impose this condition. In 2017, Congress amended the International Broadcasting Act to authorize USAGM to "condition, if appropriate, any grant or cooperative agreement to RFE/RL, Inc. [and certain other grantees] . . . on authority to determine membership of [RFE/RL's] boards." National Defense Authorization Act for Fiscal Year 2017 ("FY2017 NDAA"), Pub. L. 114-328, 130 Stat. 2000, 2550 (2016) (codified at 22 U.S.C. § 6204(20) (2017)). Congress then repealed that grant of authority. See National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022) (amending 22 U.S.C. § 6204(a) by "striking paragraph (20)"). Under these circumstances, the agency lacks power under the International Broadcasting Act to impose this condition, and it is illegal for the agency to act beyond its statutory authorization.

Additionally, the CEO of USAGM is required, in carrying out its functions, to "respect the professional independence and integrity of" RFE/RL. 22 U.S.C. § 6204(d). The condition does not respect RFE/RL's professional independence and integrity. Finally, even if this condition were not illegal, USAGM has identified no need for it to have control over the Board of RFE/RL, a private non-profit corporation, and there is no sound reason for giving USAGM such a power.

Let me also take this opportunity to further explain our objections to the other unprecedented provisions I highlighted in my email of yesterday, and why we disagree with the agency's assertion that these provisions are reasonable:

- Article I(c) – As you know, USAGM is currently the guarantor on our main lease in Prague. This was a requirement of our landlord. Therefore, if you insist that future leases must be secured solely by RFE/RL, as a practical matter this may prevent us from having a physical space in which to operate in the future. Without that physical headquarters, we cannot perform our operations.

- Article III(b) – "Deleting" entire services within 14 days remains entirely impractical. For example, RFE/RL's Ukrainian Service is an extremely complex enterprise—its employees work in three different offices (Prague, Kyiv, and Lviv); some of its reporters operate from the front lines; and, as is the case in most of the countries in which RFE/RL operates, its employees are entitled to a notice period when their employment is terminated. It would be impossible to "delete" our Ukrainian Service in two months, let alone two weeks. Furthermore, although RFE/RL is open to discussing efficiencies that can be implemented to benefit the American taxpayer, we reject the premise of this provision. RFE/RL produces content in 27 languages, and Voice of America also produces content in some of those languages. Yet RFE/RL's mission, content, and audience are unique and do not involve "duplicative programming" with VOA.

- Article V(b)(2) – As an independent 501(c)(3), we cannot agree to "a complete accounting" of all "communications and meetings – whether formal or informal" with government officials by our directors, employees, officers, contractors, staffers, affiliates and/or board members. This is intrusive and will have a chilling

effect on our work.  Further, it is also not practical to prepare a "complete accounting" of all such past communications.  For example, during the year 2024 RFE/RL had many such communications and meetings just on the subject of Alsu Kurmasheva, our reporter who was incarcerated in Russia, every single week.

- Article XII(c) – We are concerned with the demand for a USAGM audit of RFE/RL, as RFE/RL already undergoes annual audits by an accredited auditor.  These financial audits are already available to USAGM through the Federal Audit Clearinghouse or upon request.  Over the past two fiscal years, RFE/RL has submitted more than 1,200 reports to USAGM, the State Department OIG, Congress, and other federal entities.  RFE/RL is also subject to audits by the Government Accountability Office. As an independent organization, we cannot accept being subjected to additional audits by auditors chosen by USAGM without any parameters set on their qualifications or their overlap with our existing, accredited auditors.

- Article IX(a) – It is unacceptable to put a stranglehold on RFE/RL by threatening to terminate our funding on the one hand, and forbidding us to fundraise from outside sources on the other.  We are a private, independent corporation, and Congress has funded us for decades without putting any such restriction on our ability to raise funds from other sources.

Please let us know if with these further explanations you are able to accept our deletions of the above provisions that we find unacceptable.  As you know, we did not delete every new provision you proposed in the new master grant agreement, and instead proposed revisions to a number of the new provisions. But the provisions we have identified above unlawfully limit our ability to perform our mission and we cannot agree to them.  In addition to these conditions being unreasonable on their own, we view them together as falling short of USAGM's statutory obligation to make a grant "available" to RFE/RL.

We would also appreciate an explanation of what has changed since we reached agreement with you at the end of February on terms and conditions to govern the FY 25 master grant, so as to necessitate these extensive new conditions.

Finally, given that you failed to respond to our request for a mini-agreement that would provide us with April funding by today at 5 pm EDT, we assume you have rejected that request.  Please let us know if we are mistaken.

We would appreciate your response by noon EDT tomorrow, April 17, before the status conference in RFE/RL Inc. v. Kari Lake, et al.

Best regards,


-Karen

3

**Add.050**

**From:** Roman Napoli <RNapoli@usagm.gov>
**Sent:** Wednesday, April 16, 2025 2:54 PM
**To:** Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** Re: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Joe,

Thank you for the redline version of RFE/RL's proposed changes. The agency maintains that its language is reasonable. However, as a sign of its willingness to finalize a new grant agreement and provide RFE/RL with funding expeditiously, the agency is willing to change most of the 24-hour deadlines to 14 days. Please see our attached redline with embedded comments.

The agency also requests clarification as to which provision in Art. V(a) RFE/RL asserts is "illegal" and an explanation as to why RFE/RL believes it violates a specific law.

Thanks,

Roman

---

**From:** Joseph Lataille
**Sent:** Wednesday, April 16, 2025 12:12 PM
**To:** Roman Napoli; Amy Batchelor
**Cc:** Royce Min; Matthew Pollack; Marcus Murchison; Stephen Capus; Karen Johnsen; Wanda Ditrichova
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Roman,

Thank you for your response. We understand from your email below that USAGM has rejected RFE/RL's proposal that USAGM countersign the FY25 Master Grant Agreement that USAGM asked us to sign and that RFE/RL did sign on February 27, 2025.

If we are mistaken in that understanding, please let us know by 5 PM Eastern today.

Per your request below, I am attaching a redline version of the April 9 Master Grant Agreement that shows the edits we request.

We reiterate that RFE/RL urgently needs its congressionally appropriated funds for April, and we ask USAGM to consider our proposal to promptly enter into a one-month extension of the previous grant terms to cover our April expenses while we renegotiate the Master Grant Agreement.

**Add.051**

We appreciate your prompt attention to these requests and look forward to a response by 5 PM Eastern today.

Best regards,

Joe

**From:** Roman Napoli <RNapoli@usagm.gov>
**Sent:** Tuesday, April 15, 2025 6:10 PM
**To:** Joseph Lataille <LatailleJ@rferl.org>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Subject:** Re: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Hello Joe,

On the line edits to the grant agreement provided last week, leadership has asked that a red line version be provided with the specific edits RFE/RL is seeking.

Thanks.

---

**From:** Joseph Lataille <LatailleJ@rferl.org>
**Sent:** Tuesday, April 15, 2025 4:12 PM
**To:** Roman Napoli <RNapoli@usagm.gov>; Amy Batchelor <ABatchelor@usagm.gov>
**Cc:** Royce Min <RMin@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>; Stephen Capus <CapusS@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <ditrichovaw@rferl.org>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Dear Amy and Roman,

I am following up on my April 9, 2025 email below, to which I have received no response.

RFE/RL has reviewed the FY25 "Master Grant Agreement" that you sent and asked us to sign on April 9.  I wanted to provide you with our reactions. The Master Grant Agreement contains at least one provision (Article V(a)) related to RFE/RL that is clearly illegal, several conditions that are impossible to meet, and many other provisions that are unreasonable and unprecedented. All of these provisions were imposed on RFE/RL without explanation or justification, and they are a significant departure from the February 27, 2025, FY 2025 Master Grant Agreement that the parties had agreed to execute (and from our past grant agreements as well).  Meanwhile, as USAGM is fully aware, RFE/RL is in urgent need of the April funds that Congress appropriated to us and that in the normal course would have been disbursed to us at the end of March, before April 1.

5

**Add.052**

Accordingly, RFE/RL requests the following:

That USAGM, by 5:00 PM on April 16, countersign the Master Grant Agreement that you asked us to sign and that RFE/RL did sign on February 27, 2025—which you confirmed in writing on February 28 was acceptable to both parties, and that USAGM then initiate disbursement of the April funds no later than April 18.

If USAGM is for some reason unwilling to enter into the Grant Agreement that both parties agreed to on February 27:

- RFE/RL requests that the parties enter into a one-month extension of the previous grant terms, as we did with respect to RFE/RL's March 1-31 funds. We ask that this grant agreement extension be executed by 5:00 PM on April 16, and that USAGM initiate disbursement of the April funds no later than April 18. This short-term extension of the prior agreement to permit disbursement of the April funds is necessary because RFE/RL is currently suffering (and will continue to suffer) significant harms due to its lack of April funding while any negotiations proceed.

- With regard to any new Master Grant Agreement based on the draft sent to us on April 9, RFE/RL requests that USAGM, as a sign of its willingness to negotiate a new grant agreement, agree to delete the following unprecedented provisions:

  o Art. I(c) – "Any and all contracts and leases entered into by the Recipient must be secured by the Recipient solely without any guaranty, co-signing, or obligation incurred by USAGM. All leases and spaces purchased by the Recipient with grant funds must be immediately assignable to USAGM upon 24 hours notice."

  o Art. III(b) – "Insofar as the Recipient has duplicative programming with USAGM's other entities, the Recipient shall immediately reduce and delete language services upon notice by USAGM within 24 hours of such notice. Any refusal to delete language services within 24 hours of such notice shall be deemed a material breach of this agreement and shall result in the grant being terminated."

  o Art. V(a) – "All compensation, travel expenses, and other fringe benefits to the Board of Directors for the past three years must be disclosed in writing within 24 hours of signing of this agreement and on a monthly basis thereafter. All members of the Board of Directors must be U.S. citizens. Additionally, all members of the Board of Directors must be approved by the USAGM CEO. All current board members not approved in writing by the USAGM CEO must obtain approval by the USAGM CEO, or their designee, in writing. If this approval is not gained, the appointment to the Board of Directors shall be null and void. . . . Failure to obtain approval of any or all of the Board of Directors by the USAGM CEO, or their designee, shall be deemed to be a material breach of this grant agreement."

  o Art. V(b)(2) – "Within 24 hours after the execution of this Agreement, the Recipient will provide the USAGM CEO a complete accounting of all such communications and meetings – whether formal or informal – with the above-described entities, including but not limited to their directors, employees, officers, contractors, staffers, affiliates and/or board members made or held within the last 365 days."

- Art. VIII(c) – "Recipient acknowledges and agrees that USAGM may at any time hire an independent audit of all Recipient books, financials, security protocols and/or operations. Recipient is required to provide all requested information and access to USAGM and/or its designated auditors/inspectors to all books, records, facilities, and technical systems within 24 hours notice in whatever manner, electronic or otherwise, deemed appropriate by USAGM. Failure to provide such access and/or information as described above shall be deemed to be a material breach of this grant agreement."

  - Art. IX(a) – the provision specifying that RFE/RL "may not engage in fundraising from outside sources"—or if we do, we "must forgo [our] grant funds in their entirety."

- RFE/RL asks that USAGM agree to deletion of these provisions by 5:00 PM Eastern on April 16. To be clear, RFE/RL will have further requested revisions to the grant agreement that it intends to propose regarding other problematic conditions newly added to the grant agreement without explanation, but RFE/RL believes that an agreement by USAGM to delete these provisions—which are unlawful, unreasonable, and/or unworkable—is the minimum necessary to demonstrate that USAGM is actually willing to negotiate in good faith.

Given our dire situation and the unfortunate need to continue to wind down the organization (since it is April 15 and USAGM continues withholding RFE/RL's congressionally appropriated funds), please substantively respond to this email within 24 hours with specific answers to our requests. Because we have not received our April funding, RFE/RL has had to terminate nearly all its freelance agreements, has furloughed 122 Prague employees, and is currently in the process of furloughing an additional 166 employees based in RFE/RL's bureaus. If RFE/RL does not receive its April funding soon, we will be forced to furlough an additional 150-200 employees later this month and to implement a new round of furloughs effective May 1.

We look forward to receiving your response by 5:00 PM tomorrow.

Best regards,

Joe


**From:** Joseph Lataille
**Sent:** Wednesday, April 9, 2025 9:51 AM
**To:** Amy Batchelor <ABatchelor@usagm.gov>
**Subject:** RE: RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001


Are you able to quickly talk to clarify?

**From:** Amy Batchelor <ABatchelor@usagm.gov>
**Sent:** Wednesday, April 9, 2025 9:42 AM
**To:** Stephen Capus <CapusS@rferl.org>; Joseph Lataille <LatailleJ@rferl.org>; Karen Johnsen <JohnsenK@rferl.org>; Wanda Ditrichova <DitrichovaW@rferl.org>
**Cc:** Royce Min <RMin@usagm.gov>; Roman Napoli <RNapoli@usagm.gov>; Matthew Pollack <MPollack@usagm.gov>; Marcus Murchison <mmurchison@usagm.gov>
**Subject:** RFE/RL FY 2025 Master Grant Agreement - FAIN: 1060-25-GO-00001

Good morning,:

Please find the **RFE/RL FY-25 Master Grant Agreement** between the USAGM and RFE/RL attached, made available pursuant to the Full-Year Continuing Appropriations and Extensions Act, 2025, Division A of P.L. 119-4 (March 13, 2025).

At this time, USAGM intends to approve the submitted 'must pay' financial plan for **April 1-30, 2025,** in the amount of **$12,178,590.**

The Financial Assistance Identification Number (**FAIN**)for this Grant Award is **1060-25-GO-00001**.

Please provide a signed version of this Grant Agreement and your entity's **April 2025** funding request **in order to expedite the payment process**.

We will provide a copy of the bilaterally signed version of this agreement and the approved financial plan once all necessary signatures have been obtained.

Thank you,

Amy

**Amy Batchelor**
Budget Director
ABatchelor@USAGM.gov
202-920-2456



This electronic message transmission contains information which may be internal or restricted. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify the sender by telephone or by electronic reply and delete this message.

**Add.055**