# United States Court of Appeals
### For The District of Columbia Circuit

_____

**No. 25-5158**                                           **September Term, 2024**

                                                                    **1:25-cv-00799-RCL**

                                        **Filed On:** May 7, 2025

RFE/RL, Inc.,

      Appellee

     v.

Kari Lake, in her official capacity as Senior
Advisor to the Acting CEO of the United
States Agency for Global Media, et al.,

      Appellants

      **BEFORE:**   Pillard*, Katsas, and Rao, Circuit Judges

## O R D E R

Upon consideration of the motion for stay pending appeal, the response thereto, and the reply; the motion for expedited consideration; and the administrative stay entered on May 1, 2025, it is

**ORDERED** that the motion for stay pending appeal be granted. A *per curiam* concurring statement and a dissenting statement of Judge Pillard are attached. It is

**FURTHER ORDERED** that the administrative stay entered in the above-captioned case be dissolved.

### Per Curiam

                                          **FOR THE COURT:**
                                          Clifton B. Cislak, Clerk

                        BY:    /s/
                                Selena R. Gancasz
                                Deputy Clerk

*Judge Pillard dissents from the grant of the motion for stay.

PER CURIAM: For the following reasons, we grant the government's motion for a stay pending appeal.

I

The United States Agency for Global Media oversees six federally funded broadcast networks. Among these is plaintiff-appellee Radio Free Europe/Radio Liberty, which operates as a private, non-profit corporation. Through appropriations, Congress has allocated specific funding for RFE/RL, which USAGM disburses through grants. *E.g.*, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735; Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024). USAGM entered grant agreements providing funding to RFE/RL through the end of February 2025. That month, the agency also began negotiating a grant agreement with RFE/RL for Fiscal Year 2025. RFE/RL signed the agreement on February 27, but USAGM never returned a countersigned copy.

On March 14, 2025, the President issued Executive Order 14238, which directed USAGM leadership to reduce the agency to the minimum level of operations required by statute. 90 Fed. Reg. 13043. The next day, USAGM purported to terminate RFE/RL's grant agreements. Shortly thereafter, RFE/RL filed a complaint and moved for a temporary restraining order compelling USAGM to disburse $7.5 million to RFE/RL, which the network described as covering its grant entitlements for March 1–15. The network also sought a preliminary injunction "ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025." *RFE/RL, Inc. v. Lake*, No. 25-CV-799, 2025 WL 1232863, at *2 (D.D.C. Apr. 29, 2025). In response, USAGM disbursed the requested funds and later entered a grant agreement

2

providing funding for March 15–31 on the same terms as RFE/RL's grant agreement for Fiscal Year 2024.

On April 9, 2025, USAGM proposed a new "Master Grant Agreement" for Fiscal Year 2025, which differed significantly from prior agreements. Rather than sign, RFE/RL moved for a TRO "seeking immediate disbursement of congressionally appropriated funds for the period from April 1 to April 30, 2025, totaling $12,178,590." *RFE/RL*, 2025 WL 1232863, at *3. The district court stayed its hand for a time while negotiations continued. But on April 29, the court ordered USAGM to: (1) "immediately enter into a grant agreement with [RFE/RL] covering April 2025 under the same terms and conditions applicable to the most recent master grant agreement between the parties, in materially identical terms to the agreement between the parties pertaining to March 2025"; and (2) "immediately disburse RFE/RL's April funding in the amount of $12,178,590." *Id.* at *4, *10.

USAGM appealed and sought a stay of the TRO.[1] Because of imminent funding deadlines, both sides have requested expedited consideration of the stay motion.

II

To resolve the stay motion, we consider whether the government is likely to prevail on appeal, any irreparable harm to the government, harms to the plaintiffs and others, and the public interest. *See Nken v. Holder*, 556 U.S. 418, 425–26

---

[1] While TROs are ordinarily unappealable, that rule does not apply where the TRO functions as a *de facto* preliminary injunction by, for instance, ordering the immediate disbursement of funds that cannot later be recouped. *See Dep't of Educ. v. California*, 145 S.Ct. 966, 968 (2025) (citing *Sampson v. Murray*, 415 U.S. 61, 87 (1974) and *Abbott v. Perez*, 585 U.S. 579, 594 (2018)).

3

(2009). Applying these factors, we conclude that a stay is warranted.

A

The government is likely to succeed on the merits of its challenges to both terms of the district court's injunction.

1

The district court concluded that USAGM arbitrarily refused to enter into a one-month extension agreement to disburse a portion of RFE/RL's appropriated funds at similar levels to those that "in the usual course of events" would have covered its needs for the month of April. *RFE/RL*, 2025 WL 1232863, at *6–7. As a result, the court ordered the agency to enter into an agreement with the "same" terms contained in past agreements between USAGM and RFE/RL. *Id.* at *10. The district court had jurisdiction to consider whether the governing statutes required USAGM to form such an agreement. *See, e.g.*, *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1367–69 (Fed. Cir. 2021); *Lummi Tribe v. United States*, 870 F.3d 1313, 1317–18 (Fed. Cir. 2017).

On the merits, we think the government is likely to succeed. We assume *arguendo* that the parties' failure to reach a new agreement reflected reviewable final agency action by USAGM, as opposed to the ebb-and-flow of ongoing contract negotiations. Even so, the district court had no basis for binding the agency to all of the terms contained in earlier grant agreements. The governing statute gives USAGM significant latitude to establish appropriate terms for grant agreements. It provides that grants to RFE/RL "shall only be made in compliance with a grant agreement," and requires USAGM to "establish guidelines for such grants." 22 U.S.C. § 6207(g). It also instructs USAGM to limit grant funding to "activities which the Agency determines are consistent" with the general

4

statutory purpose to support international broadcasting.  *See id.* §§ 6207(g)(1), 6201.  And it permits USAGM to defund RFE/RL if the agency determines, "at any time," that RFE/RL is not carrying out that purpose "in an effective and economical manner."  *Id.* § 6207(d).  Given this degree of agency discretion, we think it unlikely that USAGM could be prohibited from seeking to renegotiate any terms in the grant agreement—a complex government contract reflected in some 31 pages of fine print.  *See* Grant Agreement Between the U.S. Agency for Global Media and RFE/RL, Inc., FAIN: 1060-24-GO-00001, *RFE/RL, Inc. v. Lake*, No. 25-cv-799 (D.D.C.), ECF Doc. 33-2, Ex. 1 at 2–34.

2

The district court further ordered USAGM to disburse funds under the terms of the contract extension that it had ordered.  For reasons explained in a related case, we conclude that the court likely lacked jurisdiction to order the payment of funds owed under a grant agreement.  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, *3–5 (D.C. Cir. May 3, 2025).

B

For substantially the same reasons discussed in *Widakuswara*, we also conclude that the remaining *Nken* factors on balance support a stay.  *See* 2025 WL 1288817, *5–6.

PILLARD, *Circuit Judge*, dissenting: I would deny the government's stay motion largely for the reasons stated in my statement dissenting from the order granting a stay pending appeal in the parallel cases brought by Radio Free Asia (RFA) and Middle East Broadcasting Networks (MBN), whose appropriated funds the government has also impounded. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *6-16 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting). Here, as there, the Tucker Act does not deprive the district court of jurisdiction. And here, as there, the government has failed to show that it would suffer irreparable harm from waiting for a panel of this court to rule on its Tucker Act defense on a non-emergency basis. Finally, as in the companion cases, the public interest cuts strongly against staying the TRO ordering payment of Radio Free Europe/Radio Liberty's (RFE/RL) April 2025 allotment, which is past due. The district court found, and the government does not dispute, that the Network is "on the brink of collapse." *RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 1232863, at *3 (D.D.C. Apr. 29, 2025) (Lamberth, J.). Congress itself has declared the continued operation of RFE/RL to be in the public interest, *see* 22 U.S.C. § 6201(3), and the district court was not required to stand aside and allow the agency to shut it down.

1. In Part I.B. of my statement in *Widakuswara v. Lake*, I explained why the government is unlikely to succeed on the merits of its assertion that the Tucker Act deprives the district court of jurisdiction over the Networks' statutory and constitutional claims. All I would add is that RFE/RL's slightly different circumstances underscore the fallacy at the heart of the government's position and vividly illustrate why *none* of the Networks' claims belong in the Court of Claims. Not only does RFE/RL's complaint make no contract claim, but RFE/RL *has no contract* that it could be seeking to enforce "disguised" as something else. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The plaintiffs here and in the parallel RFA and MBN cases all challenge the

2

government's impoundment of funds that Congress appropriated for the explicit purpose of sustaining the Networks' operations. Each Network's claim of entitlement to funding originates not in a contractual agreement, but in binding congressional enactments establishing and funding the Networks, and constitutional restrictions preventing unilateral executive action to countermand what Congress and the President put in place.

As Judge Lamberth succinctly explained in granting the TRO at issue here:

> The current Congress and President Trump enacted a law allocating funds to the plaintiffs. Under the Administrative Procedure Act, actors within the Executive Branch do not have carte blanche to unilaterally change course, withhold funds that the President and the Legislature jointly agreed to spend, and functionally dismantle an agency that the President and Legislature jointly agreed to support. If the Executive wishes to withhold or reallocate these funds, there is a statutory rescission process in place for them to seek the approval of Congress to do so. This process assures that the will of the people, expressed through their elected representatives, is borne out. But the defendants have not followed that process here. As I see it, if the defendants are aggrieved by these decisions, their problem is not with the Court, but with Congress and the President, and it is with them that the defendants should seek redress.

*RFE/RL, Inc.*, 2025 WL 1232863, at *10.

3

2.  For the reasons I already gave to reject the government's claim of irreparable harm, *see Widakuswara*, 2025 WL 1288817, at *15 (Pillard, J., dissenting), I add one further thought.  The government urges that it is likely to succeed in establishing that the district court lacks jurisdiction over plaintiffs' complaint because it belongs in the Court of Claims.  But, in the absence of a showing of irreparable harm, we would wait to decide in the ordinary course whether the government prevails on that point.  Only where there is the added ingredient of irreparable harm does the law consider the ordinary wait so untenable as to allow us to stay a likely-erroneous district court order.  The harm asserted here, however, does not justify imposing a stay that provisionally decides the jurisdictional issue in the government's favor pending resolution of the appeal—and watching the Network vanish in the meantime.

The irreparable harm the government claims, which the panel credits, is only the imminent prospect of having to pay one month's worth of past-due funds that Congress appropriated for RFE/RL's operation during April.  Yet the government does not even link that asserted harm to its claimed likelihood of success in shifting the case to the Court of Claims under the Tucker Act.  The government gives us no reason to think it would be entitled in the Court of Claims to withhold the funds the district court required it to pay.  That brings into sharp relief what the government is doing:  It claims irreparable harm and obtains a stay by insisting the case likely belongs in the Court of Claims, *not* based on any reason to think *that court* can or will approve its impoundment of funds, but as a strategy to run down the clock, avoid complying with the existing TRO, and starve RFE/RL out of existence.

3.  The balance of the equities also disfavors the stay for reasons that parallel those I discussed in *Widakuswara*.  2025

4

WL 1288817, at *14 (Pillard, J., dissenting). RFE/RL faces existential harm from our stay of the district court's temporary restraining order. The Network relies on the government for 99 percent of its funding. Fourth Capus Decl. ¶ 20. Because it has not received its funding, RFE/RL has been forced to steeply scale back its operations, including by furloughing more than 400 employees, canceling contracts with "nearly all of its freelance journalists," and canceling leases for several bureaus. *See id.* ¶¶ 21, 26. It has been unable to make lease payments for its offices, including payments for 24 locations that were due on May 1. *See id.* ¶ 25. Without the restoration of its funding, RFE/RL will be unable to pay for security services for its journalists, staff, and facilities—often located in "countries where RFE/RL journalists have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting." Compl. ¶ 43. The factual record is undisputed that RFE/RL "will have no choice but to close down the vast majority of the organization" this month if its funding is not released. Fourth Capus Decl. ¶ 28.

4. Finally, my colleagues conclude that the district court overstepped when it ordered the agency to make the overdue April payment to the Network under a one-month agreement with the "same" terms contained in past agreements between USAGM and RFE/RL. *RFE/RL, Inc.*, 2025 WL 1232863, at *10. But the *per curiam* stay order omits the crucial context that makes clear why that TRO was entirely appropriate.

USAGM and RFE/RL had used essentially the same annual Master Grant Agreement since 2011 to facilitate the disbursement of funds, negotiating a few minor changes over a couple of weeks before the start of each new fiscal year. *Id.* at *1; Fourth Capus Decl. ¶ 2. In mid-February 2025, USAGM proposed a slightly amended version of the Master Grant Agreement for FY 2025, the parties negotiated for a week,

5

USAGM sent a final version on February 27 for RFE/RL's approval, and the Network promptly signed and returned it. *RFE/RL, Inc.*, 2025 WL 1232863, at *2. USAGM then sat on the agreement without countersigning it, withheld the Network's funds, and was unresponsive to its queries. *Id.*; RFE/RL Opp'n at 9-10. On March 15, USAGM sent RFE/RL a letter abruptly terminating its grant entirely. *RFE/RL, Inc.*, 2025 WL 1232863, at *3.

After RFE/RL filed suit on March 18 and requested a TRO to disburse its funds, the agency acted just before the court hearing to release the Network's funds for the first half of March. *Id.* "In the normal course, RFE/RL receives its funding at the beginning of each month." Fourth Capus Decl. ¶ 19. When RFE/RL sent another funding request at the end of March to cover the rest of March and all of April, however, the agency sent a short grant agreement "incorporating the terms and conditions of the FY Grant Agreement" to cover funding only for March 15-31. *RFE/RL, Inc.*, 2025 WL 1232863, at *3. The Network signed the agreement and on April 8 received the balance of the March funds, but none for April. *Id.*

Then, on April 9, the agency refused to renew the Network's Master Grant Agreement unless it agreed to a "radically different grant agreement" from the one already negotiated and signed by RFE/RL at the agency's request. *Id.* at *7. The agency's new version contained "provisions to which [the Network] cannot lawfully or practically assent." *Id.* at *6-7. Indeed, the long list of new and extraordinary terms in the newly proposed Master Grant Agreement suggests that it would not secure the Network's funds but effectively sign away any right to them. *See, e.g.,* Fourth Capus Decl. ¶¶ 4, 6, 9, 10. Even so, the court initially refrained from granting the plaintiffs' request for a TRO "because negotiations over the

6

new grant agreement were still ostensibly underway." *RFE/RL, Inc.*, 2025 WL 1232863, at *3.

By the end of April, however, the district court found that the agency's persistent and "unexplained refusal" to enter into a one-month extension of the prior grant agreement suggested that the "defendants are trying to strongarm [the Network] into signing their latest version of the Master Grant Agreement." *Id*. at *6-7.  The court concluded that the agency's "stonewalling" put the Network "up against the clock as its funding quickly runs out," threatening a "complete gutting of [the Network's] infrastructure."  *Id*. at *6-8.  To prevent that outcome, the district court ordered the agency to agree to provide the Network with its April funding—which the agency had already delayed by a month, *id*. at *3—under a "mini agreement" or "bridge agreement" extending the terms of the previous grant agreement to enable payment for an additional month.  *Id*. at *4, *7.

Under these circumstances, I cannot agree with my colleagues that the district court lacked any "basis for binding the agency to all of the terms contained in earlier grant agreements."  Stay Op. at 3.  The justification was clear and amply supported the district court's grant of incremental and limited relief.  The court was not required to stand by and allow the government to continue to withhold the appropriated funds "until the [Network] is forced out of existence." *RFE/RL, Inc.*, 2025 WL 1232863, at *6 & n.5.

\* \* \*

The district court acted within its sound discretion to enter a TRO permitting the disbursement of RFE/RL's April funding.  Because the government has not made the requisite showings to support a stay and the harm to RFE/RL is

7

existential, I respectfully dissent from the panel's decision to grant the stay pending appeal.